UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA
CASE NO. 02-80438 CIV
HURLEY/LYNCH


SHELDA HARRIS BANNON, as parent
and natural guardian of her daughters,
SHARAH HARRIS and BRITTNI HARRIS,

ORIGINAL

       Plaintiffs,

vs.

THE SCHOOL DISTRICT OF PALM BEACH COUNTY,
a body corporate, ED HARRIS, individually
and in his capacity as Principal of BOCA RATON
COMMUNITY HIGH SCHOOL, and JOE SABIA, individually
and in his capacity as Girls's Basketball
Coach of BOCA RATON COMMUNITY HIGH SCHOOL,

       Defendants.
_____/

**DEPOSITION OF SHARAH HARRIS**

**TAKEN AT THE INSTANCE OF THE DEFENDANTS**


West Palm Beach, Florida
Monday, August 5, 2002
9:45 am. - 1:15 pm.

**APPEARANCES:**

    SOLMS & PRICE, P.A.
    6701 Sunset Drive - Suite 104
    Miami, Florida 33143
    Attorneys representing Plaintiffs
    BY: WILLIAM O. SOLMS, JR., ESQUIRE

    THE SCHOOL DISTRICT OF PALM BEACH COUNTY
    3318 Forest Hill Boulevard - Suite C-302
    West Palm Beach, Florida 33406
    Attorneys Defendants
    BY: BERNARD H. SHULMAN, ESQUIRE

ALSO PRESENT: Shelda Harris Bannon & Mr. Bannon


ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

## I N D E X

**WITNESS:**                                                          **PAGE**

**SHARAH HARRIS**

Direct Examination by Mr. Shulman                                        3


**EXHIBITS FOR IDENTIFICATION:**

Defendant's Exhibit No. 1                                               75

Defendant's Exhibit No. 2                                               75


**ERRATA SHEET:**                                                      141

**SIGNATURE PAGE OF WITNESS:**                                         142

**CERTIFICATE OF OATH:**                                               143

**CERTIFICATE OF REPORTER:**                                           144

# P R O C E E D I N G S

The deposition of SHARAH HARRIS, was taken before me, Sophie M. (Bunny) Springer, Notary Public, State of Florida at Large, at Jefferson Davis Middle School, 1560 Kirk Road, in the City of West Palm Beach, County of Palm Beach, State of Florida, pursuant to Notice in said cause for the taking of said deposition at the instance of Defendants in the above-entitled action pending in the above-named Court.

* * * * *

WHEREUPON,

## SHARAH HARRIS,

being by me first duly sworn to tell the whole truth as hereinafter certified, was examined and testified as follows:

## DIRECT EXAMINATION

BY MR. SHULMAN:

Q.   Sharah Harris, my name is Bernard Shulman.  I'm the attorney for the School Board in this matter, and I'm going to put a series of questions to you, and it's important that you answer the question verbally so the court reporter can put it down.

Sometimes we get a witness who does this, moves their head, and that will not record.  So either say yes or no to the questions.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1              And it's very informal.  If you don't understand
 2   the question, I'll be very happy to reword it for you.  So
 3   it's important that you understand the question as we go
 4   along.  Okay?
 5              For the record now, give us your full name.
 6        A.    Sharah Rochelle Harris.
 7        Q.    And where do you live?
 8        A.    In Delray Beach.
 9        Q.    Can you give us the exact address?
10        A.    707 Curlew Road, Delray Beach, Florida.
11        Q.    How old are you?
12        A.    Eighteen years old.
13        Q.    And your date of birth?
14        A.    6/5/1984.
15        Q.    Just speak up a little bit.
16        A.    Okay.
17        Q.    What school did you attend last year?
18        A.    Boca Raton High School.
19        Q.    And how long were you at Boca Raton High School
20   as a student?
21        A.    For one year.
22        Q.    You entered at the beginning of the year?
23        A.    Entered in the senior year.
24        Q.    You entered at the beginning of the senior
25   year --
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    Yes.

2    Q.    -- not during the year?

3    A.    Yes.

4    Q.    At the beginning of the year?

5    A.    Yes, sir.

6    Q.    Okay.  And that was grade 12?

7    A.    Yes, sir.

8    Q.    Did you graduate Boca Raton High School?  Yes?

9    A.    Yes, sir.

10   Q.    And what school did you attend before Boca Raton

11   High School?

12   A.    McEachern High School.

13   Q.    What was the name of that again?

14   A.    John McEachern High School.

15   Q.    You're going to have to help me now.

16   A.    Okay.

17   Q.    Could you spell it?

18   A.    M-c-E-a-c-h-e-r-n.

19   Q.    And that is where?

20   A.    In Powder Springs, Georgia.

21   Q.    And how many years did you attend that school?

22   A.    I attended two and a half years.

23         MR. SOLMS:  Is that Power or Powder?

24         THE WITNESS:  Powder.

25   BY MR. SHULMAN:

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      Q.   Did you ever participate in a deposition such as

2   this before?

3      A.   No, sir.

4      Q.   Were you ever involved in any litigation before?

5      A.   No, sir.

6      Q.   Okay.  Now, Sharah, tell me.  Did you participate

7   in painting a mural on the construction panels at Boca

8   Raton High School in, I believe, sometime in February?

9      A.   Yes, sir.

10     Q.   When did you first hear about this project?

11     A.   It was on the announcements at school.  They

12   announced it for all the students.  They had -- they had a

13   sign on the panel saying that we could come out and join

14   them on --

15     Q.   On the parents?

16     A.   For the -- for the students.  It was on the

17   panels at the school to present as a -- as an announcement

18   for us.

19     Q.   It was a school project?

20     A.   Yes.

21     Q.   And was the -- was the project under the auspices

22   of anyone?

23     A.   It was under Leadership, student leadership, and

24   their -- Ms. Cathy Roberts.

25     Q.   Is Leadership the student government, another

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1   word for --
 2        A.   Yes.
 3        Q.   -- student government?
 4        A.   Yes, sir, it is.
 5        Q.   So it was a school student government project?
 6        A.   Yes, sir.
 7        Q.   After you heard the announcement, did you inquire
 8   or did you hear more about the project from any other
 9   source?
10        A.   No, sir, just the announcements that were made on
11   the announcements.
12        Q.   Did you seek out -- does the name Kathy Roberts
13   mean anything to you?
14        A.   She was my teacher, as well.
15        Q.   What other function did she have at the school?
16        A.   She -- she was a sponsor for leadership class,
17   and she -- she was a coach.  I mean she was, you know,
18   involved in school that way.
19        Q.   Sure.  Okay.  Was she going to be involved in
20   this project?
21        A.   Yes, 'cause she -- because her students were the
22   ones sponsoring.
23             MR. SOLMS:  You said yes.  It calls for a yes or
24        no.  If he wants you to explain, he can ask you.
25             THE WITNESS:  Yes.
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

BY MR. SHULMAN:

Q.   The answer's yes?

A.   Yes.

Q.   That's fine.  So the entire student government group -- about how many students are involved in that, if you know?

A.   I would say between 30 to 40 students were involved --

Q.   Were they active during the year?

A.   Uh-huh.

Q.   What other kinds of things do they do, beside this project?

A.   They do Homecoming.  They do --

Q.   Homecoming?

A.   -- events.  They did like the Spring Fling and that -- that type thing.

Q.   Okay.  That's good.  Well, did anybody help Kathy Roberts with the student government, or did she run the student government alone?

MR. SOLMS:  Object to the form.

BY MR. SHULMAN:

Q.   If you know.

A.   I don't understand.

Q.   Okay.  Let me reword the question.

MR. SOLMS:  My objection is basically to the

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1          predicate.  I don't know what "run the student
 2          government" means.
 3   BY MR. SHULMAN:
 4          Q.   Could you explain what is meant by the student
 5   government?
 6          A.   Student government was -- it was a class for --
 7   for students who wanted to learn leadership, and she was
 8   the teacher of that class, but they also did the Spring
 9   Fling.  They also did other stuff for the school --
10          Q.   Right.
11          A.   -- sponsored events like that.
12          Q.   Okay.  Did they -- were they elected, or were
13   they appointed, or did they volunteer to be on it or --
14          A.   No, sir.
15          MR. SOLMS:  Objection; multiple questions, but I
16      think her answer's the same to all of them.
17          MR. SHULMAN:  Yes.  Strike that.
18   BY MR. SHULMAN:
19          Q.   Tell us how one became a member of the student
20   government?
21          A.   They went to the guidance counselor and asked for
22   the class.
23          Q.   And was that enough?
24          A.   Yes.
25          Q.   Fine.  In these other projects like Spring Fling
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   and the others that you enumerated, were there other

2   faculty members that helped Kathy Roberts?

3       A.   Mostly her.  Mostly she was the one involved in

4   the events.

5       Q.   Any others assist her?

6       A.   I can't -- I can't think of any right now.  I

7   don't -- I don't believe --

8       Q.   Could others have assisted her?

9       A.   If she needed help.  Like, it would have been if

10  she needed help if there's a big event, but mostly it was

11  just her.

12      Q.   Okay.  In this project that we're dealing with,

13  the mural painting, were any other teachers helping with

14  the project?

15      A.   No, just her.  She was the one in charge of it.

16      Q.   Just Kathy Roberts?

17      A.   Uh-huh.

18      Q.   Are you a member of any clubs at the school?

19      A.   I was a member of the Fellowship of Christian

20  Athletes, FCA.

21      Q.   And who was the sponsor of that club?

22      A.   Coach Rob Sweeten.

23      Q.   His name is Rob?

24      A.   Sweeten.

25      Q.   R-o-b?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    Yes.

2    Q.    Can you spell his last name for me?

3    A.    S-w-e-e-t-e-n.

4    Q.    Okay.  Did you discuss this project, the painting

5 of the murals, with anyone prior to the Saturday in which

6 the project was printed -- was painted?

7    A.    Just my sister, 'cause she was also in the club,

8 and I was -- my sister, and then that was about it.

9    Q.    I'm sorry.  I don't hear.

10   A.    That was all, just my sister and --

11   Q.    Only your sister?

12   A.    My sister and then -- she was in the club, and --

13 and the -- and a few members who were in the club, but

14 there wasn't -- at the time there wasn't a lot of people at

15 the meeting, so there's only about two people who heard, my

16 sister --

17   Q.    This was discussed, I gather, at a meeting of the

18 club?

19   A.    It was --

20   Q.    Yes or no.

21   A.    No, no.

22   Q.    It was never discussed at a club meeting?

23   A.    No.

24   Q.    Okay.  Did you ever discuss it with Mr. Sweeten?

25         MR. SOLMS:  At what time?  Objection.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  BY MR. SHULMAN:

2      Q.   At any time prior to the painting?

3      A.   I did come to him to see -- 'cause he was a

4  sponsor, and I went to him just to see if it was along the

5  lines of FCA and if it would be -- it would be a good

6  project for the FCA to do.

7      Q.   So you did consult with him?

8      A.   Just on that basis.

9      Q.   What question did you ask him?

10     A.   Just -- mostly just to be -- if he liked it.  I

11  mean just if he liked the signs or not.  His -- I made up

12  the words, but he -- I just asked if this would be a good

13  thing for the school.

14     Q.   And what did he say?

15     A.   He said it was a good -- it was a good sign.  It

16  was a good meaning.  It had good meaning in the words and

17  what it was representing.

18     Q.   Did he raise any questions with you?

19     A.   No.

20     Q.   Did he lead you to believe that it would be

21  absolutely proper and appropriate to do so?

22     A.   What do you --

23     Q.   To put up the words in the sign as you planned

24  it?

25     A.   He thought it was fine.  He thought what I

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  suggested was okay.

2      Q.   Did he raise any questions as to whether it would

3  be appropriate or whether he wondered about it being

4  appropriate?

5      A.   No, he thought it would be okay.

6      Q.   He thought it would be school-approved?

7      A.   Yes.

8           MR. SOLMS:  Objection; leading --

9  BY MR. SHULMAN:

10     Q.   Was there --

11          MR. SOLMS:  Wait, wait, wait.

12          Objection; leading.  When you say he thought it

13     would be school-approved, she didn't say that.

14 BY MR. SHULMAN:

15     Q.   Well, let me ask the question again.

16          Did he indicate to you that it would be school-

17 approved?

18     A.   From his knowledge, he thought it would be okay.

19     Q.   Okay.  What else was discussed with him?

20     A.   That was it.

21     Q.   I -- she's got to pick that up.

22     A.   That was it.

23     Q.   Nothing else?

24     A.   It was -- no, that was it.

25     Q.   Just one or two sentences?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    Questions --

2    Q.    Who was present when that happened?

3    A.    Me and him, probably my sister --

4    Q.    Just the --

5    A.    Just the three of us, probably.

6    Q.    Only the three of you?

7    A.    Uh-huh.

8    Q.    No other students.

9    A.    There -- no, no.

10    Q.    At any other time when this was discussed with

11 Mr. Sweeten, were there any other students around?

12    A.    Not that I can remember, no.

13    Q.    At any time when the project was discussed with

14 the club, were other students involved -- around?

15    A.    When it was -- when it was presented to the club,

16 yes, they were told.

17    Q.    Can you give me the names of those students?

18    A.    People -- the people that were in the club at the

19 time?

20    Q.    When they talked about the mural.  That's the

21 meeting I want to focus on.

22    A.    The president was there.  His name is --

23    Q.    Go slowly.

24    A.    -- C.J. Keester.

25    Q.    Go slowly now.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   C.J. Keester, he was the president.

2    Q.   C.J K-e --

3    A.   -- e-s-t-e-r.

4    Q.   Thank you.

5    A.   And his brother and sister were there.  They're

6  also --

7    Q.   Okay.  You don't know their names?

8    A.   Danny.

9    Q.   Hmm?

10    A.   Danny.

11    Q.   Danny?

12    A.   Danny.

13    Q.   And?

14    A.   Jenny, J-e-n-n-y.

15    Q.   J-e-n-n-y.  Good.  Who else was there?

16    A.   Krista Corwin.

17    Q.   K --

18    A.   K-r --

19    Q.   -- o-

20    A.   K-r-I-s-t-a.

21    Q.   K-r --

22    A.   Krista.

23    Q.   Krista.  Krista's last name, please.

24    A.   Corwin, C-o-r-w-I-n.

25    Q.   Okay.  Anyone else?  Was there a large group

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   there?  I don't want to go through a whole list of names,

2   but just one or two.

3        A.   It was about five or six people.  It was about

4   five or six people.  It was --

5        Q.   Then I'm going to ask for the others.

6        A.   Probably Liz Brown.  I think she was there,

7   Liz --

8        Q.   Liz Brown?

9        A.   Liz Brown.

10       Q.   Liz Brown.

11       A.   And that was -- that was about it as the

12  students --

13       Q.   That's it?

14       A.   Uh-huh.

15       Q.   One, two, three, four.

16       A.   Plus my sister.  She was there.

17       Q.   Four people and yourself and your sister.

18       A.   My sister.

19       Q.   Good.

20            MR. SOLMS:  I've got five.  C.J., Danny, Jenny,

21       Krista and Liz.  That's five.  And then her sister

22       would be six.  Okay?  All right.

23  BY MR. SHULMAN:

24       Q.   Can you tell me the day -- the time when that

25  meeting was held with these five people at the club?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

17

1    A.   It was the Wednesday, I think a week before the

2  project.

3    Q.   Okay.  The painting, I believe, was in

4  February --

5    A.   That was Saturday.

6    Q.   -- the 9th?

7    A.   It was on a Saturday, that's all I remember.

8    Q.   Correct.  And this was a week before?

9    A.   Yeah, a week to the -- a Wednesday a week before.

10    Q.   A Wednesday a week before, and that meeting was

11  held.  Was Mr. Sweeten at that meeting?

12    A.   Yes.

13    Q.   He was.  So Mr. Sweeten knew exactly what the

14  plans were for your painting?

15    A.   Yes.

16    Q.   Did he encourage you to do the painting?

17    A.   Yes.

18    Q.   Okay.  At that meeting, can you briefly summarize

19  what was discussed?

20    A.   Just what would be said on the panels.  I had

21  written out on sheets of paper already what -- what I had

22  suggested to write on the walls.  The certain -- I spread

23  out certain pages, and we just --

24    Q.   Was it on --

25    A.   -- discussed it.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   -- a piece of paper?

2    A.   Uh-huh.

3    Q.   More than one piece of paper?

4         MR. SOLMS: You have to say yes or no --

5         THE WITNESS:  Yes.

6         MR. SOLMS:  -- instead of un-huh or uh-uh.  Okay.

7    BY MR. SHULMAN:

8    Q.   More than one piece of paper?

9    A.   Yes, sir.

10   Q.   Any words on it that were the rationale for it or

11   just what the painting would look like?

12   A.   It was just like -- it was exactly like -- it was

13   exactly like --

14   Q.   Where are those pieces of paper now?

15   A.   I still -- I still have them, I think.

16   Q.   You still have them?

17   A.   I think so.

18   Q.   Okay.  And they were shown to Mr. Sweeten?

19   A.   Yes.

20   Q.   Can you describe to me what was on the

21   painting -- on the paper, not the mural?

22   A.   The painting --

23        MR. SOLMS: The papers.

24        THE WITNESS:  The papers.

25   BY MR. SHULMAN:

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Am I clear on that?

2    A.   The papers.

3    Q.   Not the mural, just the --

4    A.   The papers.

5    Q.   Yes.

6    A.   On the papers, one of them had in red, I think it

7  was red letting, it had, "Because He loved, He gave," and

8  it had a heart for loved, "Because He Loved, He gave; John

9  3:16," and it had a cross in the middle.  It had FCA in the

10 middle of the cross.  I might have had a border around it,

11 just a border around the -- around the paper that I would

12 put on the thing, but that was --

13   Q.   Any other words?

14   A.   "Because He loved, He gave."  Another sheet of

15 paper had, "Jesus has time for you; do you have time for

16 Him?"

17   Q.   Wait a minute.  Wait a minute.  It had what?

18   A.   The other one had, "Jesus has time for you; do

19 you have" --

20   Q.   "Jesus has time" --

21   A.   "...time for you," question mark, does he -- "Do

22 you have time for him," question mark.

23   Q.   Okay.  Anything else?

24   A.   I think -- that's all I can remember.  Those --

25 those couple right there.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     Q.   Okay.  And those two pieces of paper were

2  circulated to the club?

3     A.   Uh-huh.

4     Q.   And discussed?

5     A.   Uh-huh, yes.

6     Q.   What were the comments from the others?

7          MR. SOLMS:  Let me object to the club; which

8     club?

9          MR. SHULMAN:  The meeting that we're talking

10    about.

11         MR. SOLMS:  The Leadership Club or the FCA?

12         THE WITNESS:  Yes.

13         MR. SHULMAN:  The group on the Wednesday prior

14    to --

15         MR. SOLMS:  Thank you.

16  BY MR. SHULMAN:

17    Q.   Would you identify that so we're all clear?

18    A.   FCA.

19    Q.   That was the FCA club.  Can I call it --

20    A.   FCA is fine.

21    Q.   FCA.

22    A.   That's shorter to say.

23    Q.   Okay.  What were the comments that emanated from

24  the other four or five students that were there?

25    A.   They -- they agreed on doing it.  They agreed on

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   doing it.  They -- the people that were there agreed to

2   come that Saturday to help paint.

3       Q.   Did anyone suggest painting more than one mural?

4       A.   I did.

5       Q.   You did?

6       A.   Uh-huh.

7       Q.   Tell us what you may have suggested.

8       A.   I just -- do several murals around in different

9   areas so -- so we just, you know, just have them all the

10  way around the school.

11      Q.   How many murals were mentioned?

12      A.   I -- at the time we only thought about like two

13  or three, maybe four.  When we got there, there were more

14  panels open.

15      Q.   Only at -- only at this FCA meeting.

16      A.   At the time it was about three or four that we

17  decided on that we would probably do.

18      Q.   What was the purpose of the club's painting the

19  murals and placing them at three or four sites?

20      A.   Just for room.  Instead of all being bunched up

21  together, they'd all be kind of separated.  Just -- that's

22  it.

23      Q.   Was there a message to the murals?

24      A.   "Because He loved, He gave."  That seems pretty

25  explanatory, that He loved you so much that He would give

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    His life -- that's a very well-known scripture, and people

2    pretty much know and understand that one and understand

3    that God gave His son to die for their sins, which it just

4    meant that He loved them enough that He would do anything

5    for them.

6        Q.   It's a well-known scripture?

7        A.   Uh-huh, John 3:16.

8        Q.   John?

9        A.   John 3:16.

10       Q.   John 3:16?

11       A.   Uh-huh.

12       Q.   And it was a popular one with you as one that you

13   kind of favored?

14       A.   Uh-huh.

15           MR. SOLMS:  You have to say yes or no.

16           THE WITNESS:  Yes, sir.

17   BY MR. SHULMAN:

18       Q.   What were you hoping to accomplish by placing

19   these murals up?

20           Did you have a -- let me hold the question.

21       A.   You mean answer or you --

22       Q.   No, I want you to answer.

23       A.   Okay.  It -- it was just that -- just have

24   something good, clean-cut written on the wall, something

25   nice, something that was appropriate, something that -- it

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  was just -- it was just good.  It was just -- it was just

2  good and clean.  It wasn't -- it wasn't messy.  It wasn't

3  sloppy.  It was going to be really crisp and just

4  presentable to the school.

5      Q.   Do you believe it was a religious message?

6      A.   Yes.

7      Q.   And although I asked this before, I beg your

8  indulgence in repeating it.

9           Knowing that it was a religious message, did

10  anyone question it or did anyone come to you, or did Mr.

11  Sweeten mention it or say that there might be a question

12  attached to this from the school point of view?

13      A.   No, sir.

14      Q.   Nobody?

15      A.   No, sir.

16      Q.   Not the students?

17      A.   No, sir.

18      Q.   Did you go to Mrs. Roberts prior to putting the

19  painting up and discuss with her what you intended to put

20  up?

21      A.   No.

22      Q.   Any reason why you didn't seek out Mrs. Roberts

23  to talk to her?

24      A.   There was no -- there was really no need to.  The

25  words, I thought, were appropriate to say.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   Q.   Having attended Boca High School for a full year,

2   did you have a hint that other students may object to what

3   you put up?

4        MR. SOLMS:  Object to the form.  I think she

5        started the fall, so it wasn't quite a year.

6   BY MR. SHULMAN:

7        Q.   But you can answer.

8        MR. SOLMS:  You can answer, Sharah.

9        THE WITNESS:  I didn't think they would be

10       offended by it.  People have their feelings towards

11       it.  They -- they have their views upon it, and -- I

12       mean there's probably going to be someone that's not

13       going to like it, but -- but, you know, it's -- but I

14       thought it wasn't, you know, something that they would

15       just probably hate, you know, it was something that

16       they would just -- well, you can't do that.

17       MR. SOLMS:  Ms. Reporter, could you please re-

18       read the question because --

19       (Whereupon, the pending question was read back by

20       the court reporter.)

21       THE WITNESS:  No, I didn't.

22  BY MR. SHULMAN:

23       Q.   At Boca High School did you mingle with students

24  of different religions?

25       A.   I was friends with everyone -- I wasn't friends

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  with certain people.  I was friends with -- there wasn't

2  really a certain religion --

3      Q.   Listen -- listen -- listen to the --

4      A.   It wasn't really a certain religion, not like --

5      Q.   Listen --

6      A.   -- Buddhists or --

7      Q.   Listen.  Listen to the question.

8           In attending Boca High School, did you mingle

9  with students who you knew were of different religions?

10          It's either yes or no.  Maybe you didn't mingle

11 with them.

12     A.   No, not that I --

13     Q.   You did not mingle with them?

14     A.   I mean they might have been un-Christian or

15 unsaved or un- -- or unreligious, but they weren't -- they

16 weren't -- I mean they weren't -- probably like

17 Presbyterian or Baptist, but I mean what -- that's, you

18 know --

19     Q.   I'm sorry.  I don't understand.  I don't think

20 you answered the question.  I know you're trying Sharah,

21 and I appreciate that.

22          MR. SOLMS:  Listen to his question.

23 BY MR. SHULMAN:

24     Q.   The question is:  In attending Boca High School,

25 did you mingle with students of other religions, other than

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

26

1   Christian religion?

2        A.    What is --

3        Q.    Buddhists, Hindus, Jews, any other religion?

4        A.    Not that I know of.

5        Q.    Moslems?

6        A.    Not that I -- not that I know of, but it might

7   have been --

8        Q.    Okay.  All right.

9        A.    -- un-Christian, which is -- which is a non --

10  which is a religion if you don't believe in God, and

11  that's -- I mean I hung with people who, you know -- hmm,

12  how to say it -- if you're not -- if you're not a

13  Christian, then you're un-Christian, you're un -- you're

14  not a Christian, so that's -- that's -- they didn't believe

15  in a God, or you don't really believe in anything.

16            I did -- you know, we were with people who -- if

17  that -- if that -- if that's, you know --

18       Q.    You didn't answer the question.

19       A.    Well, I guess, no.

20       Q.    I know you're trying.

21       A.    No, it's no, but it's -- I mean how do you

22  define --

23       Q.    Well, let me help you.

24       A.    -- I mean I can't really --

25            MR. SOLMS:  How do you define what?  Finish your

1 phrases.  How do you define what?

2   THE WITNESS:  How -- I mean how do I define who's

3 not a real -- I mean I know they're Christian or not,

4 but --

5   MR. SOLMS:  You're not finishing your phrases.

6 How do you define what?  You're trying to ask him.

7   THE WITNESS:  I don't know how to -- I don't know

8 how to place it.  I don't know how to --

9 BY MR. SHULMAN:

10  Q.   We're most -- let's see if I can help.

11   Do I gather that most of the students you mingled

12 with were in the club or were known Christian students to

13 you?

14  A.   Yes.

15  Q.   Okay.

16  A.   Most of them were Christians.

17  Q.   Okay.  That's good enough.

18   Do you believe that if they were not Christian

19 students, that they did not believe in God?  Is that what

20 you tried to say earlier?

21   MR. SOLMS:  Objection to the form.

22   THE WITNESS: No.

23   MR. SOLMS:  You may answer.

24 BY MR. SHULMAN:

25  Q.   I don't know whether you said that.  I'm just

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  trying to clarify it.

2      A.   No.  They probably believe in some form of God or

3  a God or the God --

4      Q.   Yeah.

5      A.   -- but I wasn't saying that.  I was just

6  saying -- no.  That's the answer to your question.

7      Q.   So you're saying that some of the students on the

8  campus who were not Christians could also believe in God?

9      A.   If they're -- if they -- if they wanted to

10  believe -- if they chose and had the -- if they had a

11  faith, they could believe in God.  I mean --

12      Q.   Okay.  How -- the mural that was finally put up,

13  could you describe the mural?  Not the papers now at the

14  club.

15          Now let's go to the actual painting.  We're on

16  Saturday, February the 9th.  Describe the mural.

17      A.   The mural?

18      Q.   How large was it?

19      A.   I'm not good at measurements.

20      Q.   I shouldn't be jumping all these questions at you

21  but start with the size.

22      A.   I would --

23      Q.   Just approximate.

24      A.   Was it eight?  I don't -- I'm trying to think how

25  tall I am -- eight?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1      Q.    Eight feet?

 2      A.    Eight feet tall, about four feet --

 3      Q.    Okay.

 4      A.    -- but there are two panels --

 5      Q.    Okay.

 6      A.    -- per thing, so --

 7      Q.    It was large?

 8      A.    Uh-huh.

 9      Q.    Okay.

10      A.    Yes.

11      Q.    Where was this particular panel that's in

12  dispute, you know, the panel of the complaint, where was

13  that located?

14      A.    The one I did or the --

15      Q.    The one that you did?

16      A.    The one that I did was next to the office, but

17  there were several ones off from the office, as well.

18      Q.    When you say next to the office, if you come out

19  of the office, would you be looking at it?

20      A.    It would be toward your left, and it would -- you

21  would just -- it would be on your left.  You would only see

22  like a little -- like two feet, like a -- like a foot of

23  the panel.  If you were standing at the door, you would

24  only see a foot of the panel.

25      Q.    Would you call that a central location of all the
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   panels that were available?

2       A.   Yeah, I guess I would.  It was in the -- it was

3   in the middle.  It was in the --

4       Q.   Were there many students who walked back and

5   forth in front of that panel?

6       A.   It was the main hallway.  It was -- it was the

7   main hallway for the students to walk.

8       Q.   The main what?

9       A.   The main hallway or the main -- not hallway, but

10  open walkway for them to go to class.  That was the only

11  way because construction --

12      Q.   So what is the answer to my question?  Would it

13  be a highly trafficked area?

14      A.   It was because there would -- because the panels

15  were right there, yes.

16      Q.   The answer is yes.

17          Who -- now, describe -- now that we have the

18  size, describe the mural.  Tell me exactly what was on it?

19      A.   The mural had, "Because He loved, He gave," with

20  the heart, the same -- the heart for love and e-d, loved,

21  "Because He loved, He gave," and it had a cross in the

22  middle, the FCA in the cross, in the middle of the cross.

23  It had a yellow border going around it like a little

24  blocked border around it.  That's it.  That's the one I

25  did.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     Q.   Was the word "Jesus" on it?

2     A.   Not on that panel.

3     Q.   Okay.  Let's go to the other panel in which the

4 word -- in the complaint mentions the word "Jesus".  Did

5 you have anything to do with that panel?

6     A.   I was the one who wrote -- and that one.  I was

7 the one who wrote that one.

8     Q.   Describe that panel, please.

9     A.   It said, "Jesus has time for you; do you have

10 time for Him?"  That's the one I --

11     Q.   Say that again slowly.

12     A.   "Jesus has time for you; do you have time for

13 Him?"

14     Q.   That phrase, would you call that a religious

15 phrase?

16     A.   Yes.

17     Q.   Yes?

18     A.   Yes.

19     Q.   The answer is?

20     A.   Yes, yes.

21     Q.   Okay.  And was it in the nature -- did it come

22 from the Bible, or did you make that up?

23     A.   I made that one up.

24     Q.   Okay.

25     A.   I did.

1      Q.   And it was in the nature of a message; right?

2      A.   Right.

3      Q.   And what was the message trying to say?

4      A.   Well, that God --

5      Q.   'Cause you're the author.

6      A.   Right.  That -- that God had time and time for

7 them, time He -- He had time for them, for the students, or

8 do -- students, but do the people that he loved so much

9 have time for Him, did they have time for Him.

10      Like for me, it's -- like -- like He has time for

11 me, but do I have time for Him; do I have time to read my

12 Bible or to pray or to go to church or that sort of thing.

13      Q.   In other words, the message was -- you were

14 trying to convey to the -- to your fellow students that

15 because God has time for them, are they ready to

16 reciprocate and do things that God would want them to do?

17      I don't want to put words into your mouth, but is

18 that it?

19      A.   It's -- it's what the panel says.  He has time

20 for you; do you have time -- do they have time for Him.

21      Q.   Time for Him being to pray and do those things

22 that God --

23      A.   To pray.

24      Q.   -- might expect?

25      A.   To --

1    Q.   But what else?

2    A.   Read the Bible.

3    Q.   Read the Bible, pray.  Anything else that you

4  were helping students to focus on?

5    A.    I mean it's -- yeah, what they would do if they

6  believed in God; would they pray, would they read their

7  Bible, would they go to church, would they be nice to

8  others, would they -- I mean, you know, something like

9  that.

10    Q.   Okay.  As to that particular mural, was there a

11  cross on that mural, as well?

12    A.   On the Jesus one?  No, not on the Jesus one.

13    Q.   Well, the one that said --

14    A.   "Because he loved He gave" had a cross.  The

15  Jesus -- the one that had "Jesus has time for you," that

16  did not have a cross.  That -- it didn't -- the panel we

17  bought didn't have enough room to put anything else but

18  what was said on the --

19    Q.   Did it -- did the panel next to the office have a

20  cross on it, next to the --

21    A.   The one that I did, yes, it had a cross on it.

22    Q.   What were the words on that?

23    A.   "Because He loved, He gave."

24    Q.   Were there any other words on it?

25    A.   "Because He loved, He gave."  That was it.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   And those were the only words?

2    A.   John 3:16, that was it.  That was the only words.

3    Q.   You're sure about that?

4    A.   Uh-huh.

5         MR. SOLMS:  You have to say yes or no.

6         THE WITNESS:  Yes.

7    BY MR. SHULMAN:

8    Q.   But the word "Jesus" was on that panel?

9         MR. SOLMS:  On which panel?  Object to form.

10   BY MR. SHULMAN:

11   Q.   The one with the cross?

12   A.   The one with the cross had, "Because He loved, He

13   gave."  That was -- that was right there.

14        The next one down had the Jesus, then it went

15   down again, and that had another one.  It was just a wall,

16   and they -- it just went in order by the --

17        MR. SHULMAN:  Can we go off for just a moment?

18        (Whereupon, a discussion was had off the record.)

19   BY MR. SHULMAN:

20   Q.   In the complaint, Sharah, there's mention of this

21   phrase.  Let me read it to you.

22        "God loves you.  What part of thou shalt not

23   didn't you understand."  Also, the word Jesus.

24        Did you have anything to do with that panel?

25   A.   Yes.  That was further down the -- the wall.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

35

1    Q.   Oh, I see.  That was another panel?

2    A.   That was another panel.

3    Q.   Tell me about that panel.  Where was that panel?

4    A.   That was about -- they were all numbered --

5    Q.   Yes.

6    A.   -- by numbers --

7    Q.   Yes.

8    A.   -- and that was about like the tenth number down.

9    Q.   Okay.

10   A.   That was a couple down.

11   Q.   Good.  And where was that located in relation to

12   the office?  I mean the exit, the door leading in and out

13   of the office?

14   A.   You -- that was further down.  It was much

15   further down.  It was like between -- it was where the 100

16   building was, in the 100 building, which is next to the

17   office building.

18   Q.   So if you leave the office, would you see that

19   panel?

20   A.   Not -- if -- if you're going out of the office,

21   you would have to make a left and walk down several feet,

22   and then you would see it.

23   Q.   How far in feet would you say it was from the

24   office exit, if you know?

25   A.   I'm not good -- I don't -- it was just the next

1  building down, which the building's not --

2      Q.   Building or panel?

3      A.   It was like the 10th panel, but it was the next

4  building.  I'm not sure how far the building -- I don't --

5  I don't know how far the building is.  I don't --

6      Q.   Okay.  If I told you the panel was almost

7  directly opposite the exit to the office, would I be wrong?

8      A.   No, the -- the way the office was, the office --

9  the building was like this.  The panels went along this

10  way, and our -- the first one was here, and then this one

11  was like down here (indicating).  It was further down from

12  the office.  It wasn't really even close to the office.

13      Q.   Okay.  It -- that cannot be picked up.

14          What she did, for the record, is she diagramed

15  something on the table.

16          But for the record, are you saying that the panel

17  was not close to the office?

18      A.   The one -- the one that you said --

19      Q.   The one that is in the complaint that says, "God

20  loves you.  What part of thou shalt not didn't you

21  understand?  God."

22      A.   That was further down.  That was not right -- it

23  was not next to the office.  It was further down.

24      Q.   So if you left the office, you would not see it?

25      A.   You'd have to go make a right -- a left and go

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    down.  It wouldn't -- it wouldn't -- you couldn't see it

2    right from the office.  You would have to walk down.

3         Q.   Are we talking about a few steps?

4         A.   Many steps.

5         Q.   Many steps?

6         A.   Uh-huh.

7         Q.   Okay.

8              MR. SOLMS:  You have to say yes or no.

9              THE WITNESS:  Yes, many steps.

10   BY MR. SHULMAN:

11        Q.   Have you been back to see the panels since the

12   painting?

13        A.   I was on campus for one occasion, but that was

14   it.

15        Q.   Okay.  I'm just going to close my questioning on

16   that, and it might be repetitious.

17             But what I need to know, Sharah, is whether

18   you're sure of the location of that, or is that what you

19   recollect?

20        A.   No, that's -- that's what I know.

21        Q.   You know that

22        A.   I know that.

23        Q.   You're absolutely sure

24        A.   I was the one that got the panels.  I mean --

25        Q.   Was that a trafficked area?  Did students walk

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  back and forth frequently in front of that?

2      A.   They had to walk in front of that, I mean, but

3  because the construction was going on behind that, they had

4  to put a wall in front of that so the panels were right

5  there in front.

6      Q.   So if kids were going from one building to

7  another, one class to another, those -- some of those

8  students would walk past the panel?

9      A.   It was -- it was one of two ways they had to go

10  around campus.

11      Q.   One of two ways?

12      A.   One of two ways.

13      Q.   What did you mean when you wrote -- now, we're

14  talking about the panel that says, "God loves you.  What

15  part of thou shalt not didn't you understand?"  What was

16  the objective of that, those words?

17      A.   Just what it -- you mean what --

18      Q.   Yeah, I'll read it again. "God loves you.  What

19  part of thou shalt not didn't you understand?  God."

20      A.   It was just what it said.  I mean, you know, what

21  part of, you know -- I don't understand what you're asking.

22  I don't know why --

23      Q.   What did that mean to you?

24      A.   It -- what it means is -- I have to have it in

25  front of me.  I don't know.  I'm a visual person.  I've got

1  to see it.

2      Q.   Okay.  Let me --

3          MR. SOLMS:  Would you object if I show the phrase

4      to her?  She says she's a visual person.

5          THE WITNESS:  I would really --

6  BY MR. SHULMAN:

7      Q.   It's in the complaint.  That's why I'm asking you

8  about it.

9      A.   It means the Ten Commandments.  That's -- that's

10 one of the things from the Ten Commandments.  What part of

11 thou shalt not didn't you understand.

12          It means that all the ten steps, what didn't you

13 understand about them, what didn't you -- like what --

14 don't have another God before me, the other -- other things

15 in there; what part did they not understand from those Ten

16 Commandments.  That's what that means.

17     Q.   Okay.  Was it a religious message?

18     A.   Thou shalt not is in Exodus.  It is from the

19 Bible.  It is a religious message.

20     Q.   And what was -- what was the hope and desire of

21 putting that message on the panel with students walking

22 back and forth?

23     A.   It was just to say, you know, like if you've done

24 something -- if you -- if you haven't followed these rules,

25 you know, it would -- it's just -- it was a -- it was just

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  a -- it was -- the whole point was not really to have,

2  we're going to -- we're going to tell them a thing or two.

3  It wasn't that.

4       It was just -- just -- it was just a -- it was

5  just a good phrase that was, you know, it was -- I can't

6  really describe.  I can't -- you don't understand.

7       Q.   Okay.  Again, was there any talk or questions

8  about now that we've been invited to do this, let's see how

9  far we can go --

10      A.   No, no, no --

11      Q.   -- with a religious message --

12           MR. SOLMS:  Let him finish his question, please.

13           Okay.  Go ahead.

14  BY MR. SHULMAN:

15      Q.   -- that you participated in?

16      A.   No.  There was nothing -- it was not -- it was

17  not I want to get in your face, I'm going to tell you what

18  it is.  It's nothing like that.

19           It was supposed to be, you know, good --

20      Q.   Did any -- did any --

21           MR. SOLMS:  Wait.  She hasn't finished her answer

22      yet.

23           MR. SHULMAN:  I'm sorry.

24           THE WITNESS:  It was -- it was just -- it was

25      just supposed to be something that was positive,

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      nothing negative.  It wasn't like you're going to hell

2      or anything.  It wasn't anything like that.  It was

3      very positive.

4           It was something that was going to inform us in a

5      positive way, not a negative way, but a positive way.

6  BY MR. SHULMAN:

7      Q.   What else was on that panel?

8      A.   Just the words and just -- the guy who did it, he

9  did like a little art and did like a little like -- like a

10 -- a sponge paint technique on it.  It was just -- he was

11 really -- he liked to do art, and he just made it -- made

12 it look really nice.

13     Q.   Nothing else on there?

14     A.   That was the only thing, all those words.

15     Q.   Was the word "Jesus" on there?

16     A.   At the very end there was a "God".

17     Q.   Was it on there?

18     A.   It was on -- it was -- it was, "What part of thou

19 shalt not didn't you understand?  God."

20     Q.   Was there a cross?

21     A.   As if -- as if God were saying it.

22          MR. SOLMS:  He asked if the name "Jesus" was on

23     there?

24          THE WITNESS:  No, "Jesus" was not on the -- on

25     that one.


              ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

                          561/655-2300

42

1   BY MR. SHULMAN:

2       Q.   "Jesus" was not on there, in that mural?

3       A.   Uh-uh.

4       MR. SOLMS:   You have to say yes or no.

5       THE WITNESS:   No, no.

6       MR. SOLMS:   Okay.  Sorry.  I hate to sound

7   threatening --

8       THE WITNESS:   No.  No, no.  I just --

9       MR. SOLMS:   -- but I have to --

10      THE WITNESS:   I keep forgetting.

11      MR. SOLMS:   We both want the deposition to show

12  what you said.

13  BY MR. SHULMAN:

14      Q.   Okay.  Was there a cross on there?  No cross.

15      A.   No.

16      Q.   So what you're saying is on the panel it said,

17  "God loves you.  What part of thou shalt not didn't you

18  understand?"  Those were the only words, and the word

19  "Jesus" was not on there and neither was the cross?

20      A.   No.

21      Q.   And you're absolutely sure of that.

22      A.   Absolutely sure of that.

23      Q.   And that's what you painted on there?

24      A.   I didn't paint.  There was people of the club

25  that came and --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   Q.   They -- somebody painted it?

2   A.   -- and someone else painted that one.

3   Q.   Can you tell me who painted that one?

4        MR. SOLMS: Someone else painted that one --

5        THE WITNESS:  That one.  I painted, "Because he

6   loved, He gave."  That person who did the because --

7   what part of thou shalt not, yada da, that -- that

8   person painted that one.

9        I -- it was suggested for me, but I kind of

10  handed out stuff that would be -- and someone else

11  painted.

12  BY MR. SHULMAN:

13  Q.   You were working on another one?

14  A.   Uh-huh.

15  Q.   Do you know the name of the person who painted

16  that?

17  A.   That was Danny Keester.

18  Q.   Danny?

19  A.   Danny Keester.

20  Q.   Is it D-a-n-n-y?

21  A.   Yes, sir.

22  Q.   K-e-e-s-l-e-r.

23  A.   Keester.  Keester, like --

24  Q.   Keester.

25  A.   Keester.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   And is he a member of the FCA?

2    A.   Yes, he is.

3    Q.   Okay.  At any time before he did the painting,

4 did he discuss with you what his painting would be?

5    A.   No.

6    Q.   You didn't know what he was going to put up

7 there?

8    A.   He -- what we did was, we -- I had a -- it was

9 just things that were appropriate to put on the wall I had

10 in my hand.  I said you can -- this is what can be

11 presented on the wall, and I gave him a choice, and he

12 liked that one, and he went off to --

13    Q.   Oh.  In other words, you authored this one, and

14 he accepted --

15    A.   No.

16    Q.   -- this one?

17    A.   That's on -- it's -- it's in -- it's on -- it's

18 on the billboard, those -- those are on billboards, because

19 those were the ones -- it's a -- it's called the God signs,

20 and those are on bill -- there was one in Georgia that had

21 billboard signs that are like that, and they -- it came

22 from a -- it came from a list that I had, and that -- and

23 then that -- I put it -- I put it color -- I put it like in

24 marker on a sheet of paper for me just to kind of write it

25 out, see what it would look like on paper, see what it

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  would look on a wall, and I had it in my hand.

2          He saw that one and said, "Oh, that looks kind of

3  neat, you know, I want to do that one." I said okay. So I

4  handed it to him.

5          He went off to the certain panel that we paid for

6  and then painted it and drew up a little design and the

7  border that he -- that he was -- that he liked.

8      Q.  On the -- on the design that you authored, which

9  he liked, which you authored, was there --

10     A.  I didn't author that one. It was -- it was on

11  a sheet --

12          MR. SOLMS: Let him finish the question.

13          Thank you.

14  BY MR. SHULMAN:

15     Q.  Do you want to take a break?

16     A.  No.

17     Q.  Are you okay?

18     A.  Go.

19     Q.  I -- I don't mean to be --

20     A.  No, no, no. It's just kind of like --

21     Q.  I know it's --

22     A.  -- where we're going with this.

23          MR. SOLMS: That's not to you to decide.

24          THE WITNESS: I know.

25          MR. SOLMS: It's up to him.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1          THE WITNESS:  I know.  I just --

2          MR. SOLMS:  You just answer his questions.

3          THE WITNESS:  I know.

4          MR. SHULMAN:  Thank you.

5    BY MR. SHULMAN:

6       Q.   Did you put on paper a suggestion that Danny

7    said, "I like that, and I will use that," or am I

8    misunderstanding?

9       A.   I think --

10         MR. SOLMS:  Yes or no.  Is that the way it

11    happened?

12         THE WITNESS:  No.  It --

13         MR. SOLMS:  Okay.  Now, wait 'til he asks you

14    another question.

15   BY  MR. SHULMAN:

16      Q.   Tell me how it happened?

17         MR. SOLMS:  Okay.  Now he wants to know how did

18    it happen.

19         THE WITNESS:  I just explained that.  I mean it

20    just --

21         MR. SOLMS:  Tell him as clearly as you can.

22         THE WITNESS:  I had it -- the God signs came on a

23    sheet of paper.

24   BY MR. SHULMAN:

25      Q.   Whose guidelines --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1       A.   They were from like a website or something like

2   that.  They were from a website.  I don't -- I don't know

3   from -- I don't know -- they were on a sheet of paper, and

4   I had them on the sheet of paper.

5       I wrote them on a -- on another sheet of paper in

6   like marker just to see what it would look like, the color-

7   wise, what would it look like artistically.

8       I had all of these papers in a pile.  I just had

9   them all together, all these different sayings, all the

10  different things, in a pile of papers.  I presented them to

11  the FCA that day and said just pick the ones you would like

12  to do.

13      This guy, Danny Keester, picked -- picked that

14  one 'cause that -- that's one that he thought would be --

15  it was good, or he thought it was really good, and he

16  picked that one out, went to a certain panel and painted it

17  on the thing -- painted on the panel.

18      Q.   I think I understand, but the suggestion that he

19  accepted came from you?

20      A.   I -- I was -- I was the one who --

21      MR. SOLMS:  Yes or no.

22      THE WITNESS: What was the question?  Say it

23    again.

24      MR. SOLMS:  Did the suggestion come from you?

25      THE WITNESS:  I -- I don't know how to say yes or

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    no to that one.  I -- it wasn't -- I was the one who

2    was in charge of the thing, so I had to make sure that

3    certain ones were appropriate, that I thought were

4    appropriate for the panels and for the school and

5    whatnot.

6         So I was -- oh, I was the one that thought that

7    thou shalt not would be okay to put on the wall.  So I

8    wrote that on a sheet of paper.  He -- and then --

9    and he -- and he liked that one, so he took it.

10        I mean it wasn't like I was telling him what to

11   do.  It was just he was taking the sheet of paper that

12   he -- that he thought would be -- that he liked.

13   BY MR. SHULMAN:

14        Q.   Thank you.

15             Now, Sharah, you told me something about the --

16   you mentioned the word "guidelines", and then you mentioned

17   the website.  Could you explain that?

18        A.   The guidelines for -- for what?  I mean there --

19   the website was just -- it was just the phrases, the God

20   signs.  I can't think of the ones what -- that we had --

21   that was put on there, but there is like -- I can't think

22   of them right now, but the one that you mentioned, thou

23   shalt not, and there was another one, and it just was on a

24   sheet of paper that -- that --

25        Q.   What sheet of paper?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     A.   It's just a sheet of paper --

2     Q.   What --

3     A.   -- that I found, that -- that --

4     Q.   Where did you find it?

5     A.   Someone -- someone found it on a website, and

6 they gave it to me, asked me if this would be something

7 would be important, if it would be a good idea, if it would

8 be something that we would like to do.

9     Q.   Who was --

10    A.   I thought into it.

11    Q.   Who was that?

12    A.   It was -- it was a student.  It was a student in

13 school.

14    Q.   What's his name?  Is he a member of the FCA?

15    A.   Yeah, he was involved in the FCA.

16    Q.   You don't know his name?

17    A.   It was -- he was -- he was involved in the FCA.

18 He was -- he was -- he was a member of the FCA.

19         MR. SOLMS:  He asked you for his name.

20         THE WITNESS:  Yeah.

21         MR. SOLMS:  Do you remember his name?

22         THE WITNESS:  No.

23 BY MR. SHULMAN:

24    Q.   How many members were in the FCA?

25    A.   There -- there were 10 to the most.  They would

1   come in, come out, come in, come out.

2        Q.   Okay.  If there were 10 in the most, wouldn't you

3   remember one of them by name?

4        A.   I just --

5        Q.   Do you -- how can you --

6             MR. SOLMS:  Wait, wait.  She was thinking.

7   She's --

8             THE WITNESS:  I -- I --

9   BY MR. SHULMAN:

10       Q.   How can you find out his name?  What do you have

11  to do to find out his name?

12       A.   I don't know.

13       Q.   Do you want to answer that?

14       A.   I -- no.  I just --

15            MR. SOLMS:  She's not objecting.  She's --

16            THE WITNESS:  I just -- I don't -- I don't -- I

17       don't -- I don't think that's --

18            MR. SOLMS:  You don't think what?

19            THE WITNESS:  I just don't think that's really

20       relevant in what's going on here.

21            MR. SOLMS:  Well, that's not --

22            THE WITNESS:  I know, but I --

23            MR. SOLMS:  -- up to you to decide.

24            THE WITNESS:  I know, but I -- I know, but I

25       just -- I don't --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1          MR. SHULMAN:  He'll make the --

2          MR. SOLMS:  Do you feel uncomfortable revealing

3    someone's name here?

4          THE WITNESS:  No, I just -- I just don't want

5    to -- that's --

6          MR. SOLMS:  You want -- do you want her to talk

7    to me for a minute?

8  BY MR. SHULMAN:

9    Q.   If you can tell me why.  If you don't want to

10  reveal his name, I'll be glad to listen.

11    A.   No, I just -- I just don't --

12    Q.   But if you don't remember, that's different.

13    A.   No, I don't --

14    Q.   You said you did not remember.

15    A.   No.  I --

16    Q.   You're under oath.  You said --

17    A.   I know.

18    Q.   -- you do not remember.

19    A.   I know.

20    Q.   Now, do you want to change that?  Let me give you

21  a chance to think about that.

22          MR. SOLMS:  Is there a reason other than that you

23    don't remember his name that you are not giving his

24    name?  Because if you remember his name, you need to

25    say that.

1       If you don't remember his name, that's one thing.

2       If there's another reason why you don't want -- wish

3       to reveal his name, then you can also say that.

4   BY MR. SHULMAN:

5       Q.   Sharah, let me help.

6            Did any student approach you and say, "Don't get

7   me involved"?

8       A.   No.

9       Q.   The answer is what?

10      A.   No.

11      Q.   Okay.  Do you know his name?

12      A.   (No response)

13           MRS. HARRIS: She needs a break.

14           MR. SOLMS:  It's up to him.

15  BY MR. SHULMAN:

16      Q.   If -- you already told me you don't know his

17  name, and I'm trying to have you change your mind if you

18  wish to, but you don't have to.

19           I mean if you don't -- I'm going to assume in

20  this deposition that I've asked the question and you do not

21  know his name; is that correct?

22      A.   (No response)

23           MR. SOLMS:  You're under oath.

24  BY MR. SHULMAN:

25      Q.   Don't let me make the wrong assumption.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1        A.    I --

 2        Q.    What's your answer?

 3        A.    I don't -- I don't -- I don't have one.  I

 4   don't --

 5        Q.    You have to answer.

 6        A.    I --

 7              MR. SOLMS: Yes.

 8   BY MR. SHULMAN:

 9        Q.    I'm sorry.  You have to answer.  Your lawyer will

10   advise you accordingly.

11              MR. SOLMS:  May I -- may I go off the record and

12        have a conference with you outside?

13              MR. SHULMAN: Yes.  Why don't you go off the

14        record and let me leave you with her.

15              MR. SOLMS:  Yeah, let me just make sure I

16        understand.

17              (Whereupon, a discussion was had off the record.)

18   BY MR. SHULMAN:

19        Q.    Sharah, you remember that you mentioned something

20   about a list.

21        A.    Yes, sir.

22        Q.    Where did that list come from?

23        A.    It -- it came from a friend of mine, a friend of

24   mine who gave me a list, of some things that we -- might be

25   appropriate to put -- to put on for the walls.
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   And what was that friend's name?

2    A.   It was Brandon Kornblue.

3    Q.   How do you spell that?

4    A.   K-o-r-n blue, b-l-u-e.

5    Q.   Is he also a coach at the school?

6    A.   Yes, he is.

7    Q.   What does he coach?

8    A.   He coaches football.

9    Q.   Football coach?

10   A.   Uh-huh.

11        MR. SOLMS:  Was the first name Brenda?

12        THE WITNESS:  Brandon.

13        MR. SOLMS:  Brandon?

14        THE WITNESS:  Brandon.

15   BY MR. SHULMAN:

16   Q.   So the fact is that you had discussed possible

17   mural paintings with Mr. Kornblue?

18   A.   He -- he just passed it, just -- it was a real

19   quick -- we were just in the hallway, and he said, "This

20   would be kind of good, maybe be kind of good for you to do,

21   just look at it."  I said okay, and so I took it, and I

22   just --

23   Q.   Where did he get the list from?

24   A.   From a website, the God signs something.

25   Q.   Is he a member of the FCA?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      A.    He's not a member.  He -- he would be there on

2  occasions for like a sponsor.

3      Q.    He was a sponsor?

4      A.    Uh-huh.

5      Q.    And he'd participate with you in the discussions?

6      A.    Some of them, yes.

7      Q.    Some.  Was he helpful?

8      A.    He was.

9      Q.    Okay.  Did he arrange for any other events for

10  the group?

11     A.    No, sir.

12     Q.    Any field trips, any speakers?

13     A.    No, sir.

14     Q.    Okay.  How did he get involved in the mural

15  painting?

16     A.    Let me see.  He -- he was -- he was just a

17  sponsor on the side just with the other sponsors, and he --

18  I believe Coach Sweeten couldn't be there that day because

19  he had --

20     Q.    Who?

21     A.    Coach Sweeten, the main sponsor.

22     Q.    Rob -- they call him Rob?

23     A.    Coach Sweeten.

24     Q.    His name is --

25     A.    Coach Sweeten.  They call him Coach Sweeten.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  That's -- it's Rob.

2       Q.   Rob.

3       A.   First name is Rob, but we -- we usually call him

4  Coach Sweeten.

5       Q.   He couldn't be there and so Kornblue came?

6       A.   And so Coach Kornblue came.

7       Q.   Were they ever at the meetings together?

8       A.   Yes, I believe so.

9       Q.   Were they both involved in the -- in the

10 discussions about the painting, the mural?

11      A.   With -- with me or as the group or --

12      Q.   With anybody?

13      A.   Probably with the -- with the --

14      Q.   Well, let's --

15      A.   Probably with the --

16      Q.   Let's take them one at a time.  Let me help you.

17      A.   Okay.

18      Q.   With the group?

19      A.   Yes, with the group.

20      Q.   With you?

21      A.   Yes.

22      Q.   So the answer is both of these people were

23 involved with both the group and with you in the mural

24 painting?

25      A.   Yes.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

57

1     Q.   Okay.  And was there any discussion from Mr.

2  Kornblue as to the appropriateness of the painting?

3     A.   No, he -- that was decided on me.  That was

4  decided on me.

5          MR. SOLMS:  Just say no.

6          THE WITNESS:  No.  It was --

7  BY MR. SHULMAN:

8     Q.   Did he ever suggest there may be a question or

9  there may be a problem, but let's do it and see what

10  happens?

11     A.   No, sir.

12     Q.   That never came from Mr. Kornblue?

13     A.   No.

14     Q.   And it never came from Mr. Sweeten.

15     A.   Mmm, no.

16     Q.   Neither one of those two ever even raised the

17  possibility of a question if these -- if the cross and

18  these sayings were put up on the mural?

19     A.   No.

20     Q.   But they just said let's do it.

21     A.   I -- no.  They -- they didn't have a say-so.  It

22  was -- I mean it had to be student-led, and I was the

23  student who was in charge of it.

24     Q.   But did -- but in getting the suggestion list

25  from him, was he encouraging you to look at the list?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   He was -- just said here, this is -- this is it.

2   That's all he said.  I looked it over and --

3    Q.   I understand.  Do you regard that as his

4   encouraging you to look at the list?

5    A.   No, it was just -- it was just him handing it.

6   It was just him handing it to me and --

7    Q.   Why --

8    A.   That's what I perceived of it.  It wasn't him --

9   it wasn't him saying, "Do it now or you need to do it."  It

10  was just --

11   Q.   I understand, but why was he giving you the list?

12       MR. SOLMS:  It was just what -- excuse me.  She

13       didn't finish.

14       It was just what?

15       THE WITNESS:  It was just a suggestion.  I could

16       have -- it was just a source.  It wasn't --

17       MR. SOLMS:  It wasn't what?

18       THE WITNESS:  I don't know how to put it.

19       MR. SOLMS:  Okay.  Are you finished?

20       THE WITNESS: I think so.

21       MR. SOLMS:  Okay.

22  BY MR. SHULMAN:

23   Q.   But it was his suggestion?

24   A.   It was a source that -- that he had.

25   Q.   You just used the word "suggestion".

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      A.    Well, suggestion, source.

2      Q.    Okay.

3      A.    It could have been --

4      Q.    Any other faculty members that you spoke to or

5  were involved in suggestions?

6      A.    No, sir.

7      Q.    Just Mr. Sweeten and Mr. Kornblue?

8      A.    Uh-huh.  Yes, sir.

9      Q.    Okay.  Good.  Did either one of them suggest, or

10 in the list he gave you, was the suggestion made that the

11 name "Jesus" be placed on the mural?

12     A.    No.

13     Q.    Whose idea was it then that "Jesus" be placed on

14 the mural?

15     A.    That was -- that was mine.

16     Q.    Not the teacher's?

17     A.    That was mine.

18     Q.    So are you telling me on those suggested lists of

19 guidelines from the website and so forth the word "Jesus"

20 was never mentioned?

21     A.    No.  No.

22     Q.    Was not mentioned or was -- what does no mean?

23     A.    No, they were not.  No, they were not.

24     Q.    The name "Jesus" was not on the guideline?

25     A.    No.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Now, before you did the actual painting, search

2  your memory and tell me anybody else that you may possibly

3  have discussed it with.

4    A.   (No response)

5    Q.   Have you given me all the names?

6    A.   I believe so.

7         MR. SOLMS:  Is this before the fact, after the

8    fact or --

9  BY MR. SHULMAN:

10   Q.   No, this is before the Saturday.  You're at home,

11 you're at school, you're at the club, you're -- anywhere

12 else where you may have brought up where we have this

13 painting that we're going to put up, at church; anywhere at

14 all?

15   A.   No, just the friends that I mentioned before.

16   Q.   Pardon me?

17   A.   Just the friends I mentioned before, the ones in

18 the very beginning.

19   Q.   That's all?

20   A.   My sister and -- that was --

21   Q.   Your mother?

22   A.   Yeah, my mom.

23   Q.   Well, your father?

24   A.   Yes.

25   Q.   Okay.  Any uncles, cousins, clergymen?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     A.    No.

2     Q.    Who is your best friend at school?

3     A.    My sister.

4     Q.    Aside from your sister?  Aside from your family,

5  outside your family?

6     A.    It had to be -- it had to be Kristen -- Kristen

7  Reynolds.

8     Q.    What's her last name?

9     A.    Reynolds, R --

10    Q.    Reynolds?

11    A.    R-e-y- -- like Burt Reynolds, Reynolds.

12    Q.    Okay.  And you never discussed it with her?

13    A.    Not at that time, no.  No.

14    Q.    I'm talking about the time before the painting?

15    A.    Before -- before.  Yes, I'm saying at the time

16  before, no, I did not talk with her.

17    Q.    Okay.  In all of the people that you've discussed

18  it with before the painting went up, am I correct in saying

19  that you're testifying now that there was never any mention

20  that the painting could be a problem?

21    A.    No.

22    Q.    Is that statement that I just made your

23  statement?

24    A.    Yes.

25    Q.    No mention by anybody that the painting could be

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  a problem?

2       A.   No.

3       Q.   By your mother?

4       A.   No.

5       Q.   Nobody?

6       A.   Nobody.

7       Q.   How often does the -- are you a member of the

8  Equal Access -- do you know what the Equal Access Act is?

9       A.   No.

10      Q.   No.   When -- when does that fellowship club meet?

11      A.   Excuse me.   They meet on Wednesday mornings.

12      Q.   Okay.   In school?

13      A.   Before school.

14      Q.   In what room?

15      A.   One fourteen.

16      Q.   Every Wednesday?

17      A.   Pretty much, yes.

18      Q.   With Mr. Sweeten?

19      A.   Yes.

20      Q.   And permission for that meeting was granted by

21  Mr. Harris?

22      A.   Yes.

23      Q.   Did anyone ever hint or tell you that that club

24  could not meet?

25      A.   No.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Did anyone ever tell you that if you wished to
2  even pray in that club, you -- you could not pray?
3    A.   No.
4    Q.   Did you pray in that club?
5    A.   Yes.
6    Q.   And nobody said you can't; right?
7    A.   No.
8    Q.   Did anyone ever tell you or restrict you in what
9  you had to say on the campus of Boca High?
10    A.   No.
11    Q.   Did anyone -- Mr. Harris ever approach you and
12  say you can't say that?
13    A.   No.
14    Q.   On any subject?
15    A.   No.
16    Q.   Have you ever been told by any teacher on or
17  school official that you could not write or express your
18  own views in class?
19    A.   No.
20    Q.   The answer is?
21    A.   No.
22    Q.   Did you believe that when you innocently put up
23  the mural with good intent, that when students would walk
24  by and read it, they would become better people?
25    A.   Yes.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Did you, therefore, want others, Sharah, to

2 understand and accept your belief, and that that would be a

3 good thing for others to understand that?

4    A.   Yes.

5    Q.   Did you want to share your belief because your

6 belief is a strong one?

7    A.   Yes.

8    Q.   Do you have any friends at school who were not

9 Christian?

10   A.   Uh-huh, yes.

11   Q.   Name one.

12   A.   Let me think.  Jeez.

13   Q.   Okay.

14   A.   I can't -- not at the moment, but I could -- if I

15 sat down and thought about it I probably could.

16   Q.   Okay.  As a good Christian, do you believe that

17 it's important to you to be able to spread the word of God

18 as you see it?

19   A.   Yes.

20   Q.   Was there -- getting back to the murals, was

21 there any discussion about the selection of the spot for

22 the murals, like let's get the best spots we can, or I want

23 this one or let's put it where everybody can see it, not in

24 the back, any of that discussion at all?

25   A.   No, sir.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   Q.   Who assigned the murals to you, the particular

2   murals?

3   A.   Well, when we got there that Saturday, we

4   said -- and the certain panels were -- were available, and

5   we just picked the ones that were right there next to --

6   Q.   You picked --

7   A.   -- we were standing next to them.

8   Q.   You picked them?

9   A.   Uh-huh, yes.

10   Q.   Did you get there early?

11   A.   No, just on time.  There were --

12   Q.   Were there other students there at the time you

13   came?

14   A.   Yes.

15   Q.   Okay.  You think the panels were in good

16   positions for others to see them, the final selection?

17   A.   Well, yes, they were because they were the only

18   ones in the view of -- yeah.  Yes, sir.  I'm finished.

19   Q.   Okay.  How well do you know Mr. Sweeten?

20   A.   I know him pretty well.

21   Q.   Pardon me?

22   A.   I know him pretty well.

23   Q.   What does pretty well mean?

24   A.   I -- I know him well enough.  I just know him --

25   I know him -- I know him from school.  I know him from

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   school and stuff.

2   Q.   Did you know him before you went to Boca High

3   School?

4   A.   No.

5   Q.   You met him through school?

6   A.   I met him -- yes.

7   Q.   Well, let me ask you, were you ever over his

8   home?

9   A.   No.

10   Q.   You were never over his house?

11   A.   No.

12   Q.   Was he ever over your house?

13   A.   No.

14   Q.   Never came to your house, you never went to his

15   house?

16   A.   Uh-uh.

17   Q.   Okay.   Did you ever do anything with the group or

18   with Mr. Sweeten being part of that group outside of the

19   regular scheduled events of the FCA?

20   A.   No.

21   Q.   Did you ever babysit for him?

22   A.   No.

23   Q.   No.   Okay.

24   A.   He didn't have kids.

25   Q.   All right.   But your knowledge of Mr. Sweeten is

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    chiefly through the school?

2        A.    Yes, through the school.

3        Q.    And through the FCA?

4        A.    Yes.

5        Q.    Did you ever travel with him?

6        A.    Only on volleyball events.

7        Q.    Was he the volleyball coach?

8        A.    He was the volleyball coach.  That's who he was.

9        Q.    Do you regard Mr. Sweeten as being a religious

10   person?

11       A.    Uh-huh, yes.

12       Q.    How do you know that?

13       A.    Through his faith and what he stands for and --

14   through his faith and what he stands for.

15       Q.    Well, how do you know that?

16       A.    Well, just how his -- how his character was.  He

17   was -- he was kind.  He was gentle.  He wasn't -- he

18   wasn't, you know, mean and, you know, he was just --

19       Q.    Did he ever talk about his faith with you?

20       A.    Uh-huh, yes.

21       Q.    The answer is?

22       A.    Yes.

23       Q.    He did?

24       A.    Uh-huh.

25       Q.    What did he say?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   It was just kind of mutual.  We both believed in

2  God, and we both believed that -- that -- both believe in

3  God, and we both believe in the same things, and we believe

4  in God and the church and --

5    Q.   Is Mr. Sweeten a member of a church?

6    A.   Yes, he is.

7    Q.   Do you know the name of that church?

8    A.   Spanish River Church, Spanish River Church.

9    Q.   On -- do you know where it is?

10   A.   It's --

11   Q.   Is it --

12   A.   Off of Yamato?

13   Q.   If I told you where I think it is, would you

14 know?  Would that help you?

15   A.   I think maybe.

16   Q.   Does Jog Road near Spanish River High School --

17   A.   Yes -- it's near there, yes.

18   Q.   Have you ever been to that church with him?

19   A.   No, sir.

20   Q.   No, but he's a member of that church?

21   A.   Yes, sir.

22   Q.   Do you know the name of the minister of that

23 church?

24   A.   No, sir.

25   Q.   You never met the minister of that church?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     A.    No, sir.

2     Q.    What is the name of your church?

3     A.    Boca Raton Assemblies of God.

4     Q.    Boca Raton what?

5     A.    Assemblies -- Assemblies of God.

6     Q.    What is the name of the minister of that church?

7     A.    Pastor Mark Boykin.

8     Q.    Mark?

9     A.    Mark Boykin, B-o-y-k-I-n.

10     Q.    Okay. Thank you. How long did it take for you

11 to paint the mural?

12     A.    I believe we got there at 10:00, and we had to

13 end at 2:00. It was --

14     Q.    Were you there all that time?

15     A.    Yes, sir. Yes, sir.

16     Q.    When you arrived on that Saturday morning,

17 February the 9th, who did you -- what faculty member was

18 there to greet you?

19     A.    Ms. Roberts.

20     Q.    Anybody else?

21     A.    No.

22     Q.    Any parents there?

23     A.    I don't remember. I don't think so. I don't

24 remember.

25     Q.    Did your mother and father go with you?

1   A.   No.

2   Q.   No.  And did you bring supplies with you --

3   A.   Yes.

4   Q.   -- to paint?  They were your own?

5   A.   Yes.

6   Q.   And when -- in all of that time between 10:00 and

7   2:00, did Mrs. Roberts come by and see what was going up at

8   all or say anything?

9   A.   Yes.

10   Q.   Did she say anything?

11   A.   In -- not in a very -- no.  Not -- no --

12   Q.   Did she raise a question?

13   A.   No, not -- no, not then, no.

14   Q.   She didn't raise a question?

15   A.   No, she didn't.

16   Q.   When you finished at 2:00 o'clock, did Mrs.

17   Roberts see the mural?

18   A.   Yes, she did.

19   Q.   Did she raise a question?

20   A.   No.

21   Q.   She didn't?

22   A.   No.

23   Q.   Did -- did she say anything to you?

24   A.   No.

25   Q.   Did she say -- do you know whether she said

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   anything to any other student of the FCA?

2      A.   I don't -- I don't think she said anything, no.

3      Q.   So in other words, you finished the painting --

4      A.   Uh-huh.

5      Q.   -- and nothing was said that day, right, by any--

6   by Mrs. Roberts?

7      A.   No.

8      Q.   She didn't -- she didn't say, "I wonder --" did

9   anybody say, "I wonder whether this is appropriate, I

10  wonder what Mr. Harris will say?"

11     A.   No.

12          (Whereupon, discussion was had off the record.)

13  BY MR. SHULMAN:

14     Q.   After the painting was finished, you went home?

15     A.   Yes.

16     Q.   On that Saturday night, that Sunday, did anything

17  come to your attention that questioned whether the painting

18  should stay up or not?  Any rumors, anyone call you --

19     A.   No.

20     Q.   -- anybody say anything?  Nothing?

21     A.   No, sir.

22     Q.   So when you came home Sunday, you believed that

23  the painting was appropriate and nobody objected to it?

24     A.   Yes.

25     Q.   Is that what you're saying?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     A.   Yes.

2     Q.   Nobody expressed any concern?

3     A.   No, sir.

4     Q.   Nobody expressed any concerns to any of your

5 friends or cohorts and through them came back to you?

6     A.   No, sir.

7     Q.   But you left knowing and believing that the

8 success and use of the mural would help promote your

9 religion as you believe it; right?

10    A.   Yeah, yes.

11    Q.   Okay.  You felt -- did you wish to inspire and

12 impress others with a religious belief?

13    A.   No, not -- not to impress, just to -- just to --

14 just to have a good, clean positive painting on the wall.

15    Q.   As -- in other words, you wanted them to have a

16 good, clean life as you knew it?

17    A.   Just -- yes.  Yeah.  Yes.

18    Q.   Do you know what the word "neutral" means?

19    A.   Yes, sir.

20    Q.   Tell me what you think it means.

21    A.   It means not going for, not going against, just

22 staying -- staying the -- the same.  Not going with -- not

23 going with something, but not going against something,

24 you're just in the middle.

25    Q.   Do you believe that what -- the paintings that

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

73

1  went up may have to some affected the neutrality of the

2  school on religion?  May have?

3       A.   It -- it may have.

4       Q.   Did you personally have any concern about that?

5       A.   No.

6       Q.   And you had no discussions about neutrality with

7  anybody?

8       A.   No.

9       Q.   Did the word "neutrality" come up?

10      A.   No, sir.  No, sir.

11      Q.   No?

12      A.   No.

13      Q.   Did the word "impose" come up?

14      A.   No.

15      Q.   From any source?

16      A.   No.

17      Q.   Did the word "inappropriate" come up?

18      A.   Before or after?  Before?

19      Q.   All right.  Let's go one at a time.  Before?

20      A.   No.

21      Q.   To the best of your knowledge, was there any form

22  put out by the student government relative to this project?

23      A.   Not -- no, sir.

24      Q.   I didn't hear your answer.  I'm sorry.

25      A.   No, sir.

74

1  Q.  Nothing was put out?  Whether you saw it or not,

2  was there anything that you think may have been put out

3  relative to this project that talked about the project, an

4  application for the project, anything of that nature?

5  A.  They -- they just said that as long as we didn't

6  have any curse words or as long as it didn't --

7  Q.  Ah.  Well, let -- let's look at that now.  So

8  there were some -- okay.

9  Who said that?

10  A.  I believe that was Ms. -- Ms. Roberts' words.

11  Q.  So when did she tell you this?

12  A.  She didn't -- it was -- she didn't -- she didn't

13  tell me that.  It was just kind of -- it was just kind of

14  going around just to make sure that everybody knew, you

15  know, to not -- not -- to not put any curse words, you

16  know, to that -- to that nature.

17  Q.  Let me call your attention to this judging sheet.

18  Are you -- did you ever see a sheet like that before?

19  A.  No.

20  Q.  You never saw that before?

21  A.  No, sir.

22  MR. SOLMS:  Can we have that identified for the

23  record, please.

24  MR. SHULMAN:  Yeah, let me identify that as

25  Project of the Year Judging Sheet, and we'll enter

1     that into the record as Exhibit 1.

2          (Whereupon, the document referred to was marked

3     as Defendant's Exhibit No. 1 by the court reporter.)

4          MR. SOLMS:  Looks like it's several pages.

5          MR. SHULMAN:  Yeah, there are two of them.

6  BY MR. SHULMAN:

7     Q.   Did you ever see anything called Project

8  Planning, or if you didn't see it, was -- no, let me --

9  first of all, let me -- did you ever see anything like this

10 before?

11    A.   I never -- I never saw that.

12    Q.   Never saw that before?

13    A.   No, sir.

14         MR. SHULMAN:  Mark that as Exhibit 2.

15         (Whereupon, the document referred to was marked

16    as Defendant's Exhibit No. 2 by the court reporter.)

17 BY MR. SHULMAN:

18    Q.   Now, when you say about obscenities and things

19 like that, the word got around.  I think -- I'm not sure

20 I'm saying it correctly, but you said something about that.

21 Do you want to --

22    A.   It -- I mean it's like the word was kind of past

23 along.  It wasn't -- it wasn't, you know, it was just

24 how people passed it around, it was just like a certain --

25 certain students from that class were just kind of saying

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   to certain people just to make sure you know, there's no

2   cursing, no profanity, nothing --

3        Q.   Where did that come from?

4        A.   That was from the class, leadership class.  I

5   mean that -- that was from -- that was like the rules or --

6   the rules or guidelines, or whatever, towards the things.

7        Q.   Okay.  So there were some rules and guidelines

8   that came to you?

9        A.   Just only those that I mentioned.

10        Q.   No cursing?

11        A.   No cursing.

12        Q.   No obscenities?  Am I -- I don't want -- you tell

13   me what you know.

14        A.   Yeah, that's -- that's all.

15        Q.   That's all?

16        A.   That was -- yeah.

17        Q.   Did you walk around that Saturday and look at the

18   other murals at all as when you finished your painting or

19   while doing your painting?

20        A.   Yes, sir.

21        Q.   Did you approve of all of the murals that went

22   up, or are there some that you would have disapproved of?

23        A.   No.  No.

24        Q.   No what?

25        A.   No, sir.  No.  I -- there -- there's -- none

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    of -- none of the paintings.  There was -- there was one,

2    but it just -- it just had -- it just had one thing, and

3    that's the only thing that kind of stayed --

4         Q.   Do you remember that one?

5         A.   It was a -- it was a Satan sign, I believe,

6    like --

7         Q.   Satan?

8         A.   It was a Satan symbol or something -- something

9    like that.

10        Q.   You believe that belongs up in the school?

11        A.   No, sir.

12        Q.   What's your answer?

13        A.   No, sir.

14        Q.   Can you describe it?  I don't even know what a

15   Satan symbol is.

16        A.   I didn't know.  It's -- it was a circle, and it

17   had like a star in the middle of it.  A circle with a star.

18   I'm not -- I'm not even sure what it's called.

19        Q.   Okay.

20        A.   And it had like a big -- it's like -- it filled

21   up the --

22        Q.   Were there any murals up there relative to drugs?

23        A.   No.

24        Q.   Were there any murals up there relative to gang

25   symbols that you know of?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     A.   Not that -- if -- I didn't -- I didn't know it --

2     Q.   Do you know whether the school was questioning

3 whether a mural had gang symbols on it?

4     A.   I don't know, no.

5     Q.   You don't know?

6     A.   No.

7     Q.   Were there any murals up there that were just a

8 mass of graffiti?

9     A.   There -- I -- there was -- no, it wasn't graffiti

10 like -- no.

11     Q.   Were all of the paintings beautiful paintings?

12     A.   Most of them were pretty.

13     Q.   Some were not?

14     A.   Some -- there was just -- some of them just had

15 like a certain paint color that just had just what they

16 liked, like a band they liked or that type thing that, you

17 know, that's fine.

18     Q.   Any paintings have messages?

19     A.   No.

20     Q.   The only messages were the FCA messages?

21     A.   Yes.

22     Q.   All the others were without messages?

23     A.   Uh-huh.

24     Q.   Am I correct?

25     A.   Yes, sir.

79

1     Q.   Can you tell me what the purpose of the project

2 was from Mrs. Roberts' point of view and the student

3 government?  What did they want to do?

4     A.   My understanding, they just wanted to have just

5 the -- the students come out and come together, join

6 together and just have a fun time painting, you know, just

7 painting what they -- just painting a paw print or

8 painting, you know, all their friends' names or that --

9 that, you know, that kind.

10     Q.   But why did they want to paint a construction

11 wall?

12     A.   I believe it was -- it was a fundraiser for

13 the -- for -- I don't know what it was for, probably -- I

14 don't know what it was for, so I just --

15     Q.   Student government?

16     A.   I think so, but I don't -- I don't know exactly

17 the information.

18     Q.   Do you know, if you do, Sharah, do you know if

19 the student government has a fund of money that they have

20 control over?  Do they do fundraising?

21     A.   I don't -- I can't answer that.  I don't know.

22     Q.   Does the student government do things, projects?

23     A.   Yes, sir.

24     Q.   Can you name just one?

25     A.   It's kind of like the homecoming again --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  Q.   Homecoming?

2  A.   You know --

3  Q.   They try to bring everybody together?

4  A.   Yeah.  Yes, sir.

5  Q.   Good organization?

6  A.   Yes, sir.

7  Q.   You're a member of that?

8  A.   No, sir.

9  Q.   So you don't believe a mural with a hidden

10 meaning, such as a Satanic meaning, should be permitted;

11 right?

12 A.   No.

13 Q.   Should not be permitted; right?

14 A.   Right.

15 Q.   Okay.  Do you believe obscenities should be

16 permitted?

17 A.   No.

18 Q.   Do you believe anything to do with drugs should

19 be permitted?

20 A.   No.

21 Q.   Do you believe anything to do with gang symbols

22 should be permitted?

23 A.   It's -- it's not appropriate, no.

24 Q.   Not appropriate?

25 A.   Not appropriate.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     Q.   And what you just told me really came from the

2  kids themselves; right?

3     A.   Yes, sir.

4     Q.   Did anybody tell the kids themselves that it --

5  were they reflecting the will or the wishes or the desire

6  of Kathy Roberts?

7     A.   Could you rephrase -- could you --

8     Q.   No obscenities and no gang things and --

9     A.   I just -- I don't understand.

10     Q.   Do you think Ms. Roberts would permit it?

11     A.   Oh, no.  No.

12     Q.   The answer is no?

13     A.   No, she wouldn't --

14     Q.   Why -- why do you say that?

15     A.   She -- she has good morals and values that she --

16  that she, you know, that she wanted to keep within her

17  students and wanted to make sure the students kept and just

18  did the right thing and --

19     Q.   If I told you that Mrs. Roberts told me that the

20  project was a beautification project; would you agree?

21     A.   Yes.

22     Q.   If I told you -- if in light of what you know

23  about that beautification project, that Mrs. Roberts was

24  acting in good faith, would you agree?

25     A.   Yes.

1   Q.   Did you see on any of those murals anything which

2   would indicate a message that was contrary to your beliefs?

3   A.   No.

4   Q.   How would you feel if you saw something on the

5   murals that was against your religious convictions?

6   A.   I'd be -- not -- I wouldn't be upset.  I would

7   just be kind of concerned of why someone would put that on

8   the wall.

9   Q.   Would you object, honestly?

10  A.   To -- to what again?  I'm sorry?

11  Q.   Well, you're going to school every day and you

12  see something up there which is contrary to your religious

13  feelings and beliefs.

14  A.   I -- I wouldn't agree with it.  I mean I wouldn't

15  agree with it.

16  Q.   How would you feel?

17  A.   Maybe a little upset, but that -- you know, that

18  -- it would just -- I mean it would be -- I would just --

19  if it was something like a curse word, that was -- if it

20  was allowed on there --

21  Q.   No, no, no.

22  A.   -- I would feel concerned about the person who

23  did that.

24  Q.   A statement is on the mural which is contrary to

25  your religious convictions and true -- and beliefs as a

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   religious person, and it was up on that mural and you

2   walked by it every day in your school, how would you feel?

3       A.   I'd probably feel, you know, a little

4   disappointed, I guess disappointed with, you know --

5       Q.   Would you talk to anybody about it?

6       A.   My sister.  I mean, you know, I'd -- just --

7   that's --

8       Q.   Would you go to Mr. Harris?

9       A.   If it -- if it was wrong, yes, I would definitely

10  go.  If it was, you know, vile, if it was, you know, like

11  that, I would go.

12      Q.   What would make it wrong?

13      A.   If it had a curse word or if it -- or even if

14  they -- something like that.  I mean I really couldn't

15  describe that, but if it was something like that, I

16  probably would go.  I would probably be concerned and go to

17  the principal about it.

18      Q.   Okay.  Sharah, tell me, to you what does the

19  cross stand for?

20      A.   The cross stands for -- it's how Jesus died on

21  the cross and how at that time on the cross He took away

22  our sins, and that's where the -- that's where our

23  punishment laid, on the cross, and that's where -- that at

24  that time, if we believe in Jesus Christ and ask for

25  salvation, that's where our sins ended, is at the cross.

1    Q.   Sins are at the cross?

2    A.   Sins are -- they're laid, yeah.

3    Q.   Definitely a religious symbol?

4    A.   Yes, sir.

5    Q.   Is it a religious symbol for all religions?

6    A.   It would depend on the religion.   In Christianity

7  it would -- it would be a symbol, but --

8    Q.   Are all religions Christianity?

9    A.   No.   Not all of them.

10    Q.   When were you informed that the painting should

11  be altered?

12    A.   It was on --

13    Q.   Go -- go back to the very, very first hint or

14  cue.

15    A.   It was Monday, Monday after the paintings.   My

16  fourth hour class, which is my last class, that's when I

17  was noted.

18    Q.   When you came to school on Monday, did you go

19  look at the paintings?

20    A.   No, 'cause my class was before the painting, so I

21  had to stop in my class.

22    Q.   Okay.   But before the fourth period class the

23  paintings were still up; right?

24    A.   Uh-huh, yes, sir.

25    Q.   And nothing had come to your attention about

1  questioning the paintings at all; right?

2       A.   No, sir.

3       Q.   And did you show the paintings to any of your

4  fellow students, or did you talk about the paintings before

5  the fourth period class to teachers, anybody at all?

6       A.   Not -- no, not really.

7       Q.   You didn't?

8       A.   No.

9       Q.   You just came to school, went to class.

10      A.   Yeah.  There might have -- they might have asked

11 me, like what was -- what is that about and -- but I

12 didn't -- I didn't bring it -- I didn't -- I didn't bring

13 it up.  I just --

14      Q.   Who asked you?

15      A.   Probably just random people in my chorus class --

16      Q.   Many?

17      A.   -- just random.  I mean --

18      Q.   Was there discussion about the paintings on

19 Monday morning that brought people to ask you?

20      A.   There might have been -- there might have --

21 there might have been.  I just --

22      Q.   Was there or was there not?

23      A.   It was --

24      Q.   To the best of your memory, was there or was

25 there not?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      A.    There might have been.  I just -- I don't -- with

2  who, with -- you know, with who, I don't know, but --

3      Q.    But people came over and asked you about the

4  paintings?

5      A.    Could -- they -- yeah, I mean some people did,

6  yes.

7      Q.    More than one?

8      A.    Yes, I would say so.

9      Q.    More than 10?

10      A.    I couldn't -- I -- no, I -- I wouldn't think so.

11      Q.    But more than one?

12      A.    Uh-huh, yes.

13      Q.    Do you remember the names of any people who asked

14  you about the --

15      A.    It was just -- it was people in my chorus class

16  'cause that's the first class that I have.

17      Q.    Okay.  Let's talk about -- in just a minute, but

18  I'm talking about before school when the paintings

19  were -- and walking into the building, that people asked

20  you about the paintings?

21      A.    Mostly they -- some people knew it was me.  Not a

22  lot of people knew that I was the one in charge of it or

23  whatever.  They didn't -- so I mean it was just people --

24      Q.    Okay

25      A.    -- just that knew of my faith and knew that I did

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   believe in that.  I mean if they -- if they knew that --

2        Q.   Absolutely.  What did they ask you?

3        A.   They were just, "Hey, see that painting over

4   there, did you see what it said?"

5             Did you, you know, and I was like, "Yeah, I did

6   see it, you know," or exchanged, you know, that type --

7        Q.   Any of those people wonder whether it was

8   appropriate?

9        A.   No.  They just -- they thought that it was -- it

10  was great.  It was a good thing.  It was a good positive

11  thing to do and --

12       Q.   And not one person wondered, that came to you?

13       A.   No, sir.

14       Q.   Okay.  Let's go to period one now.  All right.

15            Was there discussion about it in your class?

16       A.   No, not a discussion.

17       Q.   No discussion at all, period one.  Who is that

18  teacher?

19       A.   Mr. Castle.

20       Q.   Castle?

21       A.   Castle.

22       Q.   What subject?

23       A.   Chorus.  Chorus.  Chorus class.

24       Q.   Chorus?

25       A.   Chorus.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   You sang?  First thing in the morning.  Period

2    two.

3    A.   I had to wake up real quick.  Period --

4    Q.   What's the course?

5    A.   Period two?  That was, I think, English.

6    Q.   Any discussion?

7    A.   No.

8    Q.   Who was the teacher?

9    A.   Mrs. Barnes.

10   Q.   Barnes?

11   A.   Barnes, like Barnes and Nobles, Barnes.

12   Q.   Okay.  Period three?

13   A.   That was math class.

14   Q.   Teacher?

15   A.   Coach Sweeten.

16   Q.   Who?

17   A.   Coach Sweeten.  Mr. Sweeten.

18   Q.   Mr. Sweeten.  Any discussion?

19   A.   I -- I think one of the kids brought it --

20   because most -- there was one kid that was in the class

21   that's from the leadership class, and they -- and they know

22   Coach Sweeten to -- that -- that he has of the faith and

23   belief, and so they might have come up with a question or

24   two, you know, for him or something like that, but

25   then -- and then they found out that I was the one that --

1   I was in charge of that -- they would just ask me, and they

2   would -- they would turn and ask, you know, Coach was like,

3   hey, the girl right there that did the project, why don't

4   you ask her, and I was like oh, okay, so -- and then they

5   would turn and ask -- they would ask me questions.

6       Q.   What did they ask you?

7       A.   Just maybe about my belief of why -- of why did I

8   believe in that, and just, you know, general questions

9   about my faith and, you know, about that type thing.

10      Q.   Anyone ask questions in that class about

11  whether -- there was a question about whether it should be

12  put up?

13      A.   No.  No.

14      Q.   No student?

15      A.   I can't -- I can't think of it.  I don't think

16  so.

17      Q.   Do you know a girl by the name of Megan?

18      A.   Megan?  There's --

19      Q.   Father's a minister?

20      A.   Yeah, yeah.  I knew a Megan, she --

21      Q.   She in your math class?

22      A.   No, she's not.

23      Q.   Okay.  So what you're saying now is that even

24  with Mr. Sweeten's math class, which was period number

25  three, there was some discussion about the murals?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   Yes, there was some discussion.

2    Q.   But there was absolutely no discussion as to

3  whether should it be up there or not; is that what you want

4  to say?

5    A.   I don't -- from what I -- I don't really -- I

6  don't -- I don't believe there was anything else that --

7    Q.   I'm not saying --

8    A.   -- was said.

9    Q.   -- it was bad or good --

10    A.   No, I'm just -- I don't remember.  Like there are

11  some, you know, there's people that asked me questions to

12  me personally that it just kind of came one-on-one

13  questions from people around me.

14    Q.   Well, if there -- did the discussion take most of

15  the period?  Was it a heavy discussion?

16    A.   It took a few moments.  I mean it took a few --

17  'cause some like wanted to say what they believe, and then

18  a few other people wanted to say what they believed, and

19  then just kind of went on from there, but --

20    Q.   What did Mr. Sweeten do while this was going on?

21    A.   Some people had -- had a question or something,

22  maybe he would try to answer it, and then he would come

23  back to me, and -- and -- and then he would come back to me

24  and have me answer it, you know, but, you know.

25    Q.   Did the students of that class know that Mr.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Sweeten was the sponsor of the FCA?

2        A.   Some people knew, yes.

3        Q.   What about period four?

4        A.   That was zoology with Ms. Roberts.

5        Q.   Any discussion in that class?

6        A.   No, sir.

7        Q.   Anything Mrs. Roberts say to the class, any

8    questions asked of her?

9        A.   No, sir.

10       Q.   No discussion?

11       A.   No, sir.

12       Q.   Anything happen in that class relative to the

13   murals?

14       A.   I was -- we were all at our desk.  We all were

15   sitting ready to do the class project or whatever we were

16   doing that day, and --

17       Q.   In zoology?

18       A.   -- Mr. Harris -- in zoology, and Mr. Harris came

19   in, and he was --

20       Q.   Mister who?

21       A.   Mr. Harris, the principal.

22       Q.   Did what?

23       A.   He came -- he came in and just took Ms. Roberts

24   to the side and was just kind of talking to her.  I -- I

25   don't know.  I think -- and then they talked for -- they

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  talked for a few moments, I would say about -- I mean,

2  they talked for a few moments, and then -- and then he

3  left, and then she asked if I could come outside.

4       Q.   Okay.  Are you saying that Mr. Harris pulled you

5  out of class?  Is the answer yes or no?

6       A.   Yes.

7       Q.   Mr. Harris?

8       A.   Well, it -- he had told Ms. Roberts --

9       Q.   No, I didn't ask you that.  Listen -- listen to

10 the question.

11           Did Mr. Harris pull you out of class?

12      A.   Oh, no.  No.

13      Q.   He did not?

14      A.   No.

15      Q.   Did Mr. Harris give you any instructions?

16      A.   No.

17      Q.   He did not?

18      A.   No.

19      Q.   Is that your answer?

20      A.   Yes.

21      Q.   Did Mrs. Roberts say anything to you?

22      A.   Yes, she did.

23      Q.   What did she say?

24      A.   After Mr. Harris left, she -- she just called my

25 name and she said, "I need to see you outside for a

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   moment," and I said yes, ma'am.

2          And I went out -- I went outside, and -- and then

3   she told me what Mr. Harris had just told her, that she

4   told me.

5          Q.    What did she tell you?

6          A.    She told me that -- that she would have to -- I'd

7   have to leave the class, be pulled out of class and -- and

8   leave right then and go repaint the panels.

9          Q.    Did she give you any alternatives?

10         A.    She -- she said, "Well, you know, you could have

11  used maybe "He" instead of "Jesus" or something like that,

12  but maybe you just kind of towards it where, you know, it

13  wouldn't offend anyone or like that, that you can just

14  change the 'He' -- instead of saying 'Jesus', you can just

15  say 'He', 'He loved,'" you know, and et cetera.

16         Q.    Was she indicating at that particular time that

17  the paintings were improper?

18         A.    At -- at that time she -- she said what the

19  principal had said, and the principal had said that it

20  was -- it was -- it was not -- it was not right, and that I

21  needed to go and change it then.

22         Q.    Did she tell you that she agreed?

23         A.    She said that she had no problem with it.  It

24  didn't -- it didn't offend her in any way.  It was she was

25  doing what she was told.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1     Q.   When the project began, did she tell you that she

2  instructed everyone that it had to be appropriate, and that

3  this might not be appropriate?

4     A.   No, she never said that to me.

5     Q.   Never said that to you?

6     A.   Never said that to me.

7     Q.   Did she say it, if you know, to anybody else?

8     A.   Not that I can remember, no.

9     Q.   Did you choose -- did she say that if you

10  preferred, that the custodian would alter the -- paint over

11  the painting?

12     A.   No, she gave me the -- she got a hold of me first

13  and she asked if -- she asked if it could be changed, and I

14  just -- that's when I obeyed my authority and go with it.

15  I wasn't -- no one from the janitorial had to erase

16  anything 'cause they got a hold of me.

17     Q.   I understand, but did she give you an option as

18  to whether would you like to repaint it or alter it, or the

19  school will do it if you prefer?

20     A.   They -- they said that I had to alter it.  They

21  said I had to do -- they said I had to mark out the words

22  "God".  They had -- I had to mark out the crosses.  I had

23  to mark out the "Jesus".  That was in one of them.  I had

24  to -- and that was it, the cross, the God and the Jesus.

25     Q.   Okay.  But as far as marking it off, if you --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    did they give you the option of you doing it or somebody

2    else doing it?

3         A.   It was just me.  It was --

4         Q.   They --

5         A.   They asked me to --

6         Q.   They didn't say to you that --

7         A.   No.

8         Q.   -- if you prefer, we'll do it?

9         A.   No.

10        Q.   Did they say anything like -- how did you react

11   to that?

12        A.   I cried.

13        Q.   And did you utter any -- any kind of statements

14   at all relative to that?

15        A.   I was --

16        Q.   That you remember?

17        A.   I was just kind of disappointed.  I was real

18   upset.  I -- I couldn't believe that my First Amendment

19   right was -- was affected, and that -- they force prayers

20   out of school and then now just my -- what I believe and

21   what I wrote was taken off the wall.

22            I -- I couldn't -- I couldn't believe my ears,

23   really.  I couldn't believe that someone would think that

24   that was wrong.  I couldn't -- couldn't fathom that.

25        Q.   I understand.  Do you remember any utterances or

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   remarks that you made at that time?  If you remember.

2       A.   I think I said that it feels like I'm nailing God

3   back on the cross 'cause I felt like it was --

4       Q.   I'm sorry.  I don't hear that.

5       A.   I felt -- I felt like I was nailing God back on

6   the cross, that I felt like it was -- it was the -- I was

7   doing the right thing, but I was -- I was being -- I was

8   being judged because it was bad.  I thought I was -- 'cause

9   people were thinking that it was a bad thing, and it's --

10  it's not a -- it's a very positive thing.

11       And people just, you know, it's like the guy --

12  the soldier in the -- under the cross after they crucified

13  Jesus, he -- he stood there, and he said, "That guy was the

14  man of God. That man was --" and they realized what they

15  did was wrong.

16       I just felt like that I was -- I was having to do

17  something that I knew was right but having to, you know,

18  say that it was wrong.  I -- I didn't believe that.  I -- I

19  knew that it was the correct thing.  I knew that it was

20  positive.  I knew that I was doing the right thing, and

21  that why would someone be against, you know --

22       Q.   Okay.  Do you remember any other remarks you may

23  have made?

24       A.   Except for crying a lot, that's all I --

25       Q.   Do you remember saying anything about, first

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    abortion and now this?

2         A.    No.  No, sir.

3         Q.    You don't remember that?

4         A.    No, sir.

5         Q.    Who was there when you were talking to Mister --

6    to Mrs. Roberts about and she told you --

7         A.    It was just me and -- it was just her and I.

8         Q.    Just the two of you?

9         A.    Just her and I.  She pulled me out of class.  It

10   was just her and I.

11        Q.    And not Mr. Harris?

12        A.    No, not Mr. Harris.

13        Q.    Did you have to sign, or did anyone connected

14   with the mural receive any kind of a written notice about

15   the project?

16        A.    No, sir.

17        Q.    Who paid the $5?

18        A.    The FCA, the group did.

19        Q.    Does the group have a treasury?

20        A.    Yes, sir.  Yes, sir.

21        Q.    You sure of that?

22        A.    Uh-huh.

23        Q.    Who keeps the money?

24        A.    It was kind of -- yeah, it was -- I was -- I was

25   written as the treasurer, so, I mean that was, you know,

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   back and forth.

2       Q.   I don't know what that means.

3       A.   I was -- I was written as the treasurer, so --

4       Q.   You were the treasurer?

5       A.   They -- they just -- they -- they had put that on

6   the thing, you know.

7       Q.   What bank is the money kept in?

8       A.   I don't -- I don't -- I don't know --

9       Q.   Well, who --

10      A.   -- all the -- I don't know all the -- I don't

11  know all the details of the --

12      Q.   Well, you were the treasurer?

13      A.   I was -- no, it was said I was the treasurer --

14  like they said for like certain things that I was.  I

15  wasn't --

16      Q.   Where -- where did the $5 come from?

17      MR. SOLMS:  She said I wasn't, and then she was

18      going to say something, and you interrupted her.

19      MR. SHULMAN:  Oh, I'm sorry.

20      MR. SOLMS:  I wasn't what?

21      THE WITNESS:  I wasn't -- I mean I wasn't the

22      treasurer.  I was just told I was the -- they -- it

23      wasn't -- I couldn't -- I can't describe it.

24      There was a president, but there wasn't --

25  BY MR. SHULMAN:

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   I apologize for interrupting.  I don't mean to

2  interrupt, and I'm sorry.

3    A.   No, no.

4    Q.   But were you the treasurer of the FCA?

5    A.   That was my -- that was my label, but I -- but

6  there -- but there -- that was what they put in the

7  yearbook 'cause that's -- that was my label, but I -- there

8  was -- there was just -- no.  That was --

9    Q.   You were not?

10   A.   Yes.  No and yes.  I was labeled as that, but

11  I -- I really wasn't, you know.

12   Q.   All I'm trying to do is find out where the $5

13  came from?

14   A.   Just -- I mean it was just from the FCA people,

15  FCA group, and they came together and put their money

16  together, and they -- I mean --

17   Q.   Okay.

18   A.   -- we all came together as a group and --

19   Q.   Each one made a contribution?

20   A.   The group, yeah, all together.

21   Q.   They each put in some money?

22   A.   Yes.

23   Q.   And who collected the money?

24   A.   It wasn't -- wasn't me.  It was -- I think at the

25  time someone else held the money for -- someone else held

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    the money.

2         Q.   Who was that someone else?

3         A.   It was Krista Corwin.

4         Q.   What's his name?

5         A.   Krista Corwin.

6         Q.   Oh.

7         A.   Yeah, I mentioned her before.

8         Q.   So everybody pitched in, and Krista held the

9    money, and that was the $5?

10        A.   Yes.

11        Q.   Did Mr. Sweeten contribute to the $5?

12        A.   I -- I don't -- he -- he might have.  I don't --

13   I don't know if he did or not, but --

14             MR. SOLMS:  I don't know -- you either know or

15        you don't, so if you don't know, tell him you don't

16        know.

17             THE WITNESS:  No, I don't -- I don't know.  I

18        don't know.

19   BY MR. SHULMAN:

20        Q.   Mr. Kornblue contribute to the $5?

21        A.   I don't -- I don't know.  I don't think so.

22        Q.   You don't know?

23        A.   I don't know.

24        Q.   Do you know of any teacher who contributed to the

25   five?  Mrs. Roberts contribute to the $5?

1    A.   No.  No, sir.

2    Q.   Do you know what the purpose of the $5 was?

3    A.   It was -- it was a fundraiser for the -- for

4    the --

5    Q.   Do you believe that the principal has the

6    authority to manage the school?

7    A.   Yes.

8    Q.   Do you believe the principal should take down a

9    satanic symbol if it's put up on the wall?

10    A.   Just the symbol, yes.

11    Q.   Or if it's a message that is contrary to a

12    religious belief?  If it's a satanic message, should that

13    come down?

14    A.   Yes.

15    Q.   If there's a swastika that goes up, should that

16    come down?

17    A.   What?  Sorry, what the -- what is -- what is --

18    what did you say?

19    A.   A swastika.

20    Q.   What's that?

21    A.   German emblem.

22    Q.   Let me -- let me draw it.

23    A.   Oh, I wouldn't agree -- I wouldn't agree with

24    that.  I think that's, you know, that's --

25    Q.   So Mr. Harris would be proper in saying take that

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  down?

2      A.   Yes.

3      Q.   The answer is?

4      A.   Yes, sir.

5      Q.   If there was something advertising drugs that

6  went up, would he be proper in saying, hey, take that down?

7      A.   I hope he would take it down.

8      Q.   You hope?

9      A.   That's not the message being sent to our kids in

10  school.

11     Q.   So although we may disagree with what he did, but

12  would you agree that he was acting in good faith?

13     A.   I think he was trying to do what he thought would

14  be the best.  I mean, I --

15     Q.   All right.  Why would he think that that was the

16  best?

17     A.   Which one?  Mine?

18     Q.   Mr. Harris.

19     A.   My -- my panels or the other --

20     Q.   I'm asking yours, others.

21          MR. SOLMS:  Wait a second.

22          THE WITNESS:  I don't understand --

23          MR. SOLMS:  Okay.  She's asking whether it was

24     hers or the others, and you're saying both; right?

25          MR. SHULMAN:  Both.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1       MR. SOLMS:  Okay.

2       THE WITNESS:  I still don't understand what

3   you're asking.  What do you mean --

4   BY MR. SHULMAN:

5       Q.   Well, you said you thought he was -- he was

6   acting in what he thought was best, and I'm wondering what

7   was -- what was in -- why you think he was acting in what

8   was best?

9       A.   I think people were persuading him.  I think

10  people were kind of putting in their opinion about what

11  they believed and what not, and he just wanted to make

12  every -- make sure everybody was happy and make sure

13  everything was going kind of smoothly and just kind of run

14  it over so it wouldn't -- wouldn't be a really big deal.

15  It would just kind of, you know, go over real smoothly with

16  people.

17      It'd be kind of fixed real quick, you know, just

18  erase it, don't worry about it, you know, just get it done

19  that day so nothing will be said of it.

20      Q.   So he was concerned about the decorum of the

21  school?

22      MR. SOLMS:  Objection to the form.  Tell him if

23  you know.

24      THE WITNESS: You say --

25      MR. SOLMS:  It has to come from what you know.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1          THE WITNESS:  I don't understand what you -- the

2     word you just said.

3   BY MR. SHULMAN:

4     Q.   Well, you said he took --

5     A.   No, the word you just said.

6     Q.   Okay.  I'm sorry.

7     A.   It's all right.

8     Q.   He was concerned about the school running in a

9   happy way?

10     A.   Yeah, I would -- I would say that, you know.

11     Q.   Nothing evil about what Mr. Harris did?

12     A.   No, no.

13     Q.   Okay.  Did you feel that some faculty members,

14   parents, community, students, although very respectful,

15   might feel a little ostracized -- that's a bad word --

16   might feel not belonging under the -- that sign?

17          MR. SOLMS:  Objection to the form that it

18     includes different people from the community.  It

19     lumps students and faculty together.

20          MR. SHULMAN:  Let's take them one at a time.

21          MR. SOLMS:  Yes.

22   BY MR. SHULMAN:

23     Q.   Do you feel some students would feel a little out

24   with walking past the sign?

25          MR. SOLMS:  Her signs?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      MR. SHULMAN:  Your sign.

2      MR. SOLMS:  Okay.

3      THE WITNESS:  It depended on how they felt.  I

4   mean, I'm not them and they're not me.  I mean it

5   would depend on what they believe or not.  I mean, I

6   couldn't answer for them.

7   BY MR. SHULMAN:

8      Q.   Well, Mr. Harris acted in good faith, you

9   mentioned that, and was he thinking of the student body?

10      A.   He was --

11      MR. SOLMS:  Objection.  She can't say what Mr.

12   Harris thought one way or another unless Mr. Harris

13   told you.

14      THE WITNESS:  No, he didn't -- he didn't say

15      MR. SOLMS:  Okay.  Don't guess or speculate.

16   BY MR. SHULMAN:

17      Q.   When Mrs. Roberts -- and Mrs. Roberts spoke to

18   you and she quoted Mr. Harris, did she indicate what Mr.

19   Harris was trying to do?

20      A.   Yes, she did indicate.

21      Q.   What did she -- what did she tell you Mr. Harris

22   was trying to do?

23      A.   He was -- he was just trying to kind of fix it.

24   He didn't -- he didn't know how -- he didn't know how it

25   really fixed it.  He just knew that it needed to be done

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  because, you know, he was being, you know, persuaded by the

2  people that it -- it was wrong or something, that maybe he

3  thought that.

4       Q.   Did he tell you what he thought was wrong about

5  it?

6       A.   Not -- not specifically, not, you know.

7       Q.   Did she tell you that Mr. Harris made a decision

8  relative to the appropriateness of the painting?

9       A.   I -- I can't -- I don't -- I don't remember the

10  -- the exact words that she used.

11       Q.   No, I know.

12       A.   But he was just trying to fix it.  I mean I can't

13  really -- he was just trying to kind of not get it on the

14  table but trying to just get it over with and fix it.  I

15  think he felt like --

16       Q.   Did she tell you what he was trying to fix?

17       A.   Just that -- that it might have, you know, no,

18  she didn't -- she didn't really say what he was trying to

19  fix or what he was trying to -- it was just that I guess

20  people thought, his perspective, that maybe it was wrong or

21  something like that, so then he was just trying to fix it

22  so everybody would be happy, you know, everybody would be

23  okay with it, and, you know  --

24       Q.   Are you saying that she told you that he was

25  trying to prevent discord or divisions on the -- on the

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  school?

2      A.   I guess you could put it that way.  I mean --

3      Q.   Okay.  The school is a forum for learning?

4      A.   Yes.

5      Q.   And is it important in learning that you have a

6  situation where the students are not upset?

7      A.   What are you -- what's -- what's -- what's the --

8  what's the --

9      Q.   Let me strike that.

10         If you disagree with Mr. Harris' decision, do you

11  believe that he had a right to make the decision?

12     A.   He's -- he's the principal.  He has to do what he

13  needs to do to -- to make sure that everyone's happy at the

14  school and --

15     Q.   So let's --

16     A.   -- everybody's being --

17     Q.   What's the answer?

18     A.   He's just -- just trying to do his job, I guess.

19  I mean he's just trying to -- that he knows best, his

20  wisdom, to make sure everybody was happy in the situation,

21  I guess.

22     Q.   If you disagreed with his decision, do you

23  believe he had a right to make that decision?

24     A.   I don't -- I don't understand what --

25     Q.   As principal of the school, did Mr. Harris have a

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    right to make that decision?

2         MR. SOLMS:  If you know or don't know.  Don't

3    speculate.

4         THE WITNESS:  I don't -- I don't -- I don't know.

5    I don't know what you're trying to say.  So I'm not --

6    just -- I'm not -- I don't know.

7    BY MR. SHULMAN:

8    Q.   In having graduated that school, do you believe

9    that a principal is in charge of the school?

10   A.   I -- that's his job.  He's supposed to be in

11   charge of the school.  Is that what you're asking?  Is that

12   what you're trying --

13   Q.   Yes.  I'm asking, I'm going to repeat.

14        If you disagree with his decision, do you believe

15   he had a right to make the decision as principal of the

16   school?

17   A.   I believe it was a wrong decision.  I believe

18   that he -- he obviously did not defend what was the true

19   thing to defend.

20   Q.   Was the fence part of the school property?

21   A.   I guess.  I mean it was on -- it was on the

22   property, yes.

23   Q.   If the sign had remained up there, do you think

24   that would have interfered with the school's neutrality on

25   religion?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    It's -- I don't -- I don't think so.  I don't --

2    Q.    Did anybody tell you when you did the project how

3 long the painting would be up?

4    A.    They said for the next four years.

5    Q.    For the next four years?

6    A.    Until the -- until -- or until the construction

7 was finished.  Then they would keep up -- they would keep

8 the panels up as long as construction was going on.

9    Q.    And who told you that?

10    A.    That -- I was -- heard it from Ms. Roberts.

11 That's what I -- that's what I heard from the --

12    Q.    Ms. Roberts?

13    A.    -- leadership class and the people --

14    Q.    Ms. Roberts told you that?

15    A.    -- Ms. Roberts.  Yeah.

16    Q.    Now, what school official told you that?

17    A.    It was -- it was from Ms. Roberts' class.  It was

18 from her --

19    Q.    Pardon me?

20    A.    From Ms. Roberts' class.  It was -- she -- she

21 was the one that said it, but her, you know, it was within

22 the class.  She said that --

23    Q.    Are you telling me that Mrs. Roberts said that

24 that would remain up for four years; Mrs. Roberts?

25    A.    That's what I heard, yes.  That's --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   I'm having a difficult -- who did you hear it

2 from?

3    A.   I heard it from Ms. Roberts.  It was -- it was

4 Ms. Roberts.  That's who she -- that's who said it.

5    Q.   Mrs. Roberts said that it would remain up for

6 four years?

7    A.   Yes, sir.

8        MR. SOLMS:  And then she said or until the

9        construction --

10        THE WITNESS:  Or until the construction's been

11        finished, 'cause that's why the panels were up,

12        because the construction was going on.  They had to

13        block off certain areas of the school because kids

14        weren't allowed.

15 BY MR. SHULMAN:

16    Q.   Did you hear anybody say it would stay up for

17 only that semester?

18    A.   No.

19    Q.   No?

20    A.   No.

21    Q.   Did anyone else hear or, to your knowledge, come

22 to you and say, "Well, I thought it was going to be up only

23 for that semester."

24    A.   Oh, no.

25    Q.   Nobody?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    No.

2    Q.    Did any student ever come over to you and say who

3  was behind this, is the school behind it?

4    A.    No one thought the school was behind it.

5    Q.    What do you mean, no one?

6    A.    No one in my knowledge believed that the school

7  was behind the project or the panels.

8    Q.    Did any student suggest to you, is the school

9  behind it?

10    A.    No.

11    Q.    Nothing came to your attention?

12    A.    No, sir.

13    Q.    Did anybody say anything to the effect, is it

14  okay with the school?

15    A.    Not -- not that I heard, no.

16    Q.    Did anybody say to you, is the school going to be

17  upset?

18    A.    Not from my knowledge, no.

19    Q.    Would you call placing a mural on the fence a use

20  of the school building?

21    A.    It was my words.  It wasn't -- I mean it was --

22    Q.    No, no.

23    A.    Are you saying the actual painting, the actual

24  panels, or are you saying my words on the panels were from

25  the school?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      Q.   I'm asking the question whether the project, the

2 painting that went up on the plywood of the construction

3 fence, was a use of the school building where if you did

4 something in class on a piece of paper, that would be part

5 of a school assignment, your own piece of paper.

6      A.   I mean it was -- yes, it was school property.

7      Q.   Okay.

8      A.   It was --

9      Q.   All right.  It's the property of the school.

10      (Whereupon, discussion was had off the record.)

11 BY MR. SHULMAN:

12      Q.   Was there any confusion in the minds of some as

13 to whether the club or an individual should in fact place

14 the painting on the mural, place the painting up?

15      A.   It was the club, the club.

16      Q.   Do you think that some people might feel that the

17 mural being on school property involved the school?

18      A.   No.

19      Q.   You don't?

20      A.   No.

21      Q.   Why not?

22      A.   'Cause it had to be student led.  It had to be --

23 a student or students had to bring up the subject.

24      Q.   Do you believe that a student-led group can put

25 anything up on the school property, as long as it's student

1   led?

2       A.   Yes.

3       Q.   Anything?

4       A.   As long as it's appropriate, yes.

5       Q.   As long as it's appropriate?

6       A.   Yes.  Not vile, not, you know.

7       Q.   If somebody walked by the fence and saw that

8   religious message up on the fence, what would a reasonable

9   person think?

10      A.   If it was my kid -- no.  I hope that -- hope

11  that -- I -- I -- if it was someone that was of my

12  background, I would -- they'd probably say you go, girl,

13  something like that, you know, just, you know, way to go,

14  good job; encouraged by it, you know.

15      Q.   And if there were a message that was contrary to

16  that person's religion, what would a reasonable person then

17  say?

18      A.   Probably the opposite.  No.

19      Q.   Okay.

20      A.   Yeah.

21      Q.   Do you want to say anything else?  Okay.

22           Did Mr. Harris order the whole sign be painted

23  over?

24      A.   No, just -- just the words.  Just "God" and

25  "Jesus" and the cross.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   He left the rest of the sign okay?

2    A.   Uh-huh.

3    Q.   Just certain selected words; is that right?

4    A.   Yes.

5    Q.   Am I correct?

6    A.   Yes, sir.

7    Q.   Who's the one who selected what should be painted

8    over?  Ms. Roberts?

9    A.   No.  I was the one that had to recorrect all the

10   paintings.

11   Q.   But how -- how did you determine what should be

12   painted over, what should be left?

13   A.   'Cause they -- they said we want the -- all the

14   "Gods", which was about eight "Gods" that were put -- that

15   were on panels, we had to erase those, and there were about

16   three crosses and one "Jesus" that had be painted over.

17   Q.   They were specifically pinpointed?

18   A.   Yes, sir.

19   Q.   You didn't make those decisions?

20   A.   No, sir.  That's what I was told to do.  I was

21   just trying to be obedient to what I was being told.

22   Q.   And, again, I'm going to ask you.  Did Ms.

23   Roberts at the same time direct any other paintings to be

24   painted over?

25   A.   No, no.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   To your knowledge?

2    A.   Not to my knowledge.

3    Q.   Were there any non-religious murals that were

4  also altered?

5    A.   No.  No, sir.

6         MR. SOLMS:  Is that no or yes?

7         THE WITNESS:  No.

8         MR. SOLMS:  No?

9  BY MR. SHULMAN:

10    Q.   To your knowledge?

11    A.   To my knowledge, no.  No.

12    Q.   But you're not -- are you positive that there

13  were no non -- or is it just to your knowledge?

14    A.   There was -- no.

15    Q.   No what?

16    A.   Not -- not to my knowledge, no.

17    Q.   I'm sorry?

18    A.   Not to my knowledge, no.

19    Q.   Not to your knowledge?

20    A.   No.

21    Q.   Was it your hope that when the students saw the

22  mural that you painted, that they would do some looking

23  into themselves and look at themselves more carefully?

24    A.   That's how people saw it.  I mean it was -- it

25  was just mostly just to put something that was -- that was

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   nice and crisp and clean, nothing messy, nothing dirty,

2   nothing -- it was just -- that was the whole point.  It

3   wasn't let's get people saved.  It wasn't -- it was -- I

4   mean --

5            MR. SOLMS:  Just answer the question.

6            THE WITNESS:  You know, it wasn't, you know.

7            MR. SOLMS:  Answer his question, okay?

8   BY MR. SHULMAN:

9       Q.   Were you hopeful that people would -- that when

10  you put up the mural, that -- and the message and so forth,

11  that people would pay attention to it?

12      A.   That wasn't really the point of it, no.  I

13  mean -- no.

14      Q.   The answer is no?

15      A.   Uh-huh.

16      Q.   Were you hopeful that when they read the message

17  or saw the message, that that might give them a sense of

18  awareness of their place in the world --

19      A.   I mean --

20      Q.   -- and under God?

21      A.   It was -- it was -- I mean hope it was --

22            MR. SOLMS:  Wait.

23            THE WITNESS:  -- influential, but --

24            MR. SOLMS:  Okay.  Wait a second.

25            You went through these questions.  I've got them

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   on my Page 3, you asked her what the objection of the

2   sign was.  You went through this litany of questions

3   again.

4        Is there any reason why you have to repeat it

5   now?

6        MR. SHULMAN:  All right.

7        MR. SOLMS:  I want to give you every opportunity.

8   I'm not going to instruct her not to answer, but it's

9   repetitive.

10        MR. SHULMAN:  Well, in a way it's repetitive.

11   I'll withdraw the question.

12        MR. SOLMS:  Fine.

13   BY MR. SHULMAN:

14   Q.   But this question is not repetitive.

15        Do you believe that that was an expression of

16   free speech, or do you think there was a purpose or attempt

17   to advance religion?

18   A.   It was free speech.

19   Q.   Okay.  Did you ever engage in an event called

20   Meet Me Round the Flagpole or something like that?  I may

21   be misquoting it.

22   A.   Meet You at the Pole.

23   Q.   Hmm?

24   A.   Yeah, Meet You at the Pole.

25   Q.   Yes.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      A.   That was one of the events that took place, I

2 think in September, I think.

3      Q.   You were one of the what?

4      A.   It was in September.

5      Q.   Were you one of the organizers of that?

6      A.   No.  It's a -- it's a high -- it's kind of a --

7 not a holiday, but for those all around public schools all

8 the way around the nation, they can at that day come and

9 pray at their flagpole.

10      Q.   Nothing wrong with that.

11      A.   No.

12      Q.   Okay.  Anybody stop you from doing that?

13      A.   No, sir.

14      Q.   Anybody encourage you to do that?  Any of the

15 faculty join you?

16      A.   It's -- it's for parents and -- it's for adults

17 and children as well to come and pray at the --

18      Q.   Mr. Sweeten there?

19      A.   Yes, sir, I believe he was.

20      Q.   He was there.  Mr. Kornblue, probably, too?

21      A.   I don't -- I don't think I saw him that day.

22      Q.   But you saw Mr. Sweeten.  Nobody objected to

23 that?

24      A.   No, sir.

25      Q.   Were any teachers there?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   There -- yeah, there were teachers there.   It

2  was -- it was open for everyone to -- even parents that --

3  that at the school who wanted to come down and pray, they

4  could, as well.

5    Q.   Now, you said when you had to paint it over or

6  when you were told to paint it over, you cried?

7    A.   Yes.

8    Q.   How else were you affected, if at all?

9    A.   It was a lot of work.  My arm hurt from all the

10  painting.  We had to paint a lot that night.

11    Q.   By doing that painting or painting over it,

12  knowing your religion whatever it may be, in any way

13  that -- did that deprive you of practicing your religion?

14    A.   No, sir.

15    Q.   The answer is?

16    A.   No, sir.

17    Q.   Because you had to paint over the painting, did

18  that make you feel that you could not treat your religion

19  as you would like to treat it?

20    A.   No.

21    Q.   Would you like to see religious instruction given

22  to the public school students during schooltime?  Would

23  that be a good thing?

24    A.   I think it would positive if someone --

25    Q.   I don't hear it.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   Yes, it would be positive.

2    Q.   Did you ever have a real deep conversation about

3    religion on the campus of Boca High?

4    A.   Not that I can remember.

5    Q.   At any time between classes and class, cafeteria?

6    A.   We might have like in the cafeteria or something

7    like that talked about it, I mean like talked about our

8    faith in the cafeteria or during off times when we weren't

9    busy with our schoolwork, we would talk about our faith.

10   Q.   So you could have?

11   A.   Yes.

12   Q.   Anybody prevent you -- well, I mentioned that.

13        Was there ever any assignment given to you in

14   school that involved religion?

15   A.   Not that I can remember.  I don't think so.

16   Q.   Were you ever asked to write an essay or

17   something about your feelings and what you chose to do is

18   express your religious values --

19   A.   No, not --

20   Q.   -- in school?

21   A.   No, I wasn't.

22   Q.   Have you ever seen gang symbols on the school?

23   A.   I don't know -- I don't --

24   Q.   The walls there?

25   A.   No, I haven't.  I don't know what they are.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      Q.   Before this beautification project, did people

2  put anything on those walls?

3      A.   Not before, no, sir.

4      Q.   They were absolutely pure white and --

5      A.   They were blank.

6      Q.   -- no marks on it, no graffiti, nothing at all?

7      A.   Not that I can remember.

8      Q.   Do you know a Mr. Pollock?

9      A.   No, sir.

10     Q.   Teacher at the school?

11     A.   No, sir.

12     Q.   Do you know a Dr. Romeo?

13     A.   Yes, sir.

14     Q.   Have you had any discussions with him about this?

15     A.   No, sir.

16     Q.   On Monday night after you altered the painting

17  and you came home, did you discuss it with your mother?

18     A.   Yes.

19     Q.   What did your mother say to you?

20     A.   She was --

21     Q.   I'm sorry.  I'm having trouble hearing.

22     A.   She was pretty sad, pretty upset, pretty

23  disappointed, kind of like I was, same feelings that I had.

24  We, you know, just couldn't believe that someone would

25  alter, you know, the word "God" when a curse word is

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    allowed to be said and then the name "God" is rejected.   It

2    was kind of -- it was kind of shocking.

3        Q.   On Monday night after the painting was altered

4    you were home.   Did you do your homework as usual?

5        A.   Yes.

6        Q.   Were you in school the next day?

7        A.   I think I -- I think I missed the first block, I

8    think.   It took so long to repaint that --

9        Q.   Well, this is the next day, Tuesday.

10       A.   I know.   That's -- and I was tired.   So I just --

11       Q.   But were you in school the next day?

12       A.   Half -- half-day.   I came in the second block.

13       Q.   You came in late?

14       A.   I came in the second block.

15       Q.   Did you miss any other additional days of school?

16       A.   No, sir.

17       Q.   What reasons did your mother give you to make you

18   think that the painting was proper?

19       A.   Well, first of all our belief, and we believe

20   that -- that God does love us and that He does love others.

21   Even he loves those who don't love him back.

22            We believe that we need to talk to God.   There

23   are times we need to talk to God, and there's times we need

24   to sit down -- He does have time for us, and that -- that

25   we should have more time for Him, as well.

1    Q.   Did you ever receive a handbook at the beginning

2    of the school year?

3    A.   Yes, sir.

4    Q.   You remember that?

5    A.   Yes, sir, and a little day planner, as well.

6    Q.   Did you take that handbook home?

7    A.   Yes, sir.

8    Q.   Did you read what's in that handbook?

9    A.   Yes, sir.

10   Q.   So you know what the handbook contains?

11   A.   If I didn't forget anything, yes.

12   Q.   Pardon me?

13   A.   Yes, sir.

14   Q.   The answer's yes?

15        MR. SOLMS:   She said, "If I didn't forget

16   anything."

17        THE WITNESS:   If I didn't forget anything that I

18   read.   There's a lot of stuff in there.

19   BY MR. SHULMAN:

20   Q.   Did you play any sports at the school?

21   A.   No, sir.

22   Q.   You're not involved in any athletic teams?

23   A.   No.

24   Q.   Do you believe that if there was no permission

25   given by Mr. Harris to the students, that they still would

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   have a right to paint on the construction panels?

2        A.   I believe they -- yes.  Are you asking -- wait.

3        Q.   If he didn't give permission to use the panels,

4   would the students still have the right to put a painting

5   on the panel?

6        A.   If they could?

7        Q.   The answer's yes?

8        A.   I still don't --

9        Q.   Let me -- let me help.  You're right.

10       Do you believe that if Mr. Harris, the principal

11  of the school, did not give permission to a student or

12  students to paint on the panels, that they still have a

13  right to paint on the panels?

14       MR. SOLMS:  Excuse me for a second.  You're

15       giving her a hypothetical because it may be that he

16       did not give permission, or is this like related to

17       some evidence that's going to come up later that

18       the -- this happened without the principal's knowledge

19       and consent?

20       MR. SHULMAN:  I'm going to tie it in later, but I

21       mean at this -- if she -- I'm trying to find out --

22       MR. SOLMS:  Okay.  I'll object on the ground of

23       relevancy.

24       Go ahead.  If you know.

25  BY MR. SHULMAN:

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   If a student wanted to paint a panel and did not

2  ask permission from Mr. Harris, do you believe that student

3  had a right to paint the panel?

4    A.   It was -- I'm not -- I still don't -- I don't --

5         MR. SOLMS:  If -- tell him if you know, don't

6     know or have an opinion, but don't guess.

7         THE WITNESS:  I don't -- I don't --

8  BY MR. SHULMAN:

9    Q.   I have a bucket of paint and I go to the school

10 fence, and I'm a student at the school, I don't ask

11 anybody's permission, can I paint something on the panel?

12        MR. SOLMS:  Same objection.

13        THE WITNESS:  I don't -- I'd have to think about

14    it.

15 BY MR. SHULMAN:

16   Q.   Your answer is?

17   A.   I'd have to -- I'd have -- that's a question I'd

18 have to think about.  I don't know the answer to that right

19 now.  I --

20   Q.   You have to think about it?

21        MR. SOLMS:  She doesn't know at this time.

22 BY MR. SHULMAN:

23   Q.   Do you know why Mr. Harris and Ms. Roberts left

24 the panel in place without the cross and the message and

25 the word "Jesus"?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   Because they thought it was inappropriate.

2    Q.   Pardon me?

3    A.   They thought it was inappropriate.  They -- they

4  made me change it because they thought that something was

5  wrong.

6    Q.   But as to the rest of the panel --

7         MR. SOLMS:  Do you understand his question?

8  BY MR. SHULMAN:

9    Q.   They left the rest of the panel in place; didn't

10  they?

11   A.   They just picked certain words.

12   Q.   Yes.

13   A.   That's it.

14   Q.   Do you have any idea what he was attempting to do

15  by eliminating those words and keeping the rest of the

16  panel in place?

17   A.   Trying to make me happy.  He was trying -- I mean

18  he was trying to please everyone around, trying to make me

19  happy and saying that my panel was still up, but -- but

20  having to change the name and change it to "He", which -- I

21  mean it's not the same without --

22   Q.   Do you know when Mr. Harris reviewed the panels,

23  walked around and saw the panels?

24   A.   I don't know.

25   Q.   Do you know whether he did?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.   I don't know.

2    Q.   Did Ms. Roberts tell you that he did?

3    A.   No, she didn't tell me he did.

4    Q.   Do you know of any official policy or custom that

5 you were told or that you know of that deprived you of what

6 you think is your constitutional right?

7    A.   They -- they made me take the thing away.

8 They -- they made me take the signs -- they made me take

9 the certain --

10    Q.   Take away the words; right?

11    A.   Take away the words, yes.

12    Q.   Do you believe that parents possess a right to

13 raise their children without undue state influence as --

14    A.   Whoa, not understand.

15    Q.   Do you believe that parents have the right to

16 raise their children without the state interfering?  The

17 state being the school.

18    A.   I don't -- don't understand.

19    MR. SOLMS:  You don't call him Dr. Shulman for

20    nothing.  He knows that stuff.

21 BY MR. SHULMAN:

22    Q.   Did you go to see a doctor or a hospital after

23 this event at all because of the event?

24    A.   No, sir.

25    Q.   Other than your feeling bad about it, was there

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   any physical problem that you experienced?

2       A.    No, sir.

3       Q.    Okay.  After you altered the painting, where did

4   you go?  You left the class fourth period?

5       A.    I left the class fourth period, and I had to --

6   they said I had to change it then, and I -- and I asked

7   them could I just change it after school.  I said

8   that's -- I was in a dress, and I was -- I was

9   unappropriately dressed to repaint.

10          So I asked Ms. Roberts if I could come back after

11  school so it'd be more appropriate for myself to go and

12  paint -- repaint the panels.

13          And after that we -- mom came to school and she

14  had some clothes, and I went and changed and repainted.

15      Q.    During school?

16      A.    After school.

17      Q.    Okay.  So you went to your fifth period class?

18      A.    I don't have fifth period class.

19      Q.    Pardon me?

20      A.    There's no fifth period class.  There's only four

21  periods.

22      Q.    Oh, there's only four periods in the day, and

23  Mrs. Roberts' class was the last period?

24          MR. SOLMS:  Where were you?  You're from the

25      school.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   MR. SHULMAN:  I'll tell you about my school days.

2   BY MR. SHULMAN:

3   Q.   So you -- you went home after that with everybody

4   else?

5   A.   I stayed there after school and got my clothes

6   that mom sent --

7   Q.   Okay.

8   A.   -- and then I went, changed them and went to go

9   repaint.

10   Q.   So you painted after school?

11   A.   After school.

12   Q.   The school day was over.  I'm sorry.  I got it.

13   Anybody help you?

14   A.   Krista Corwin, good friend.

15   Q.   Did your mother go to school to speak to Mr.

16   Harris about this; do you know?

17   A.   At the time I don't -- no, that day, I don't --

18   Q.   The next day?

19   A.   She --

20   Q.   The next week?

21   A.   I know she -- I know she went to him.  What time

22   of day I don't -- I don't know.  I knew she went to him,

23   though.

24   Q.   She -- after this event she did go see him?

25   A.   Yes.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Okay.  Were you with her?

2    A.   No.

3    Q.   She saw him alone?

4    A.   I don't -- I don't remember.

5    Q.   Did your mother tell you what Mr. Harris said?

6    A.   She -- yes.

7    Q.   What'd she say?

8    A.   She just -- he just explained that, you know, the

9  exact same thing that he had told me, that it was just

10 inappropriate, and he thought that -- that it needed to be

11 changed.

12   Q.   Okay.  Do you believe that all students are

13 entitled to a school which is harassment free?

14   A.   Yes.

15   Q.   Do you believe there should be a policy to that

16 effect, that the principal should make sure that the school

17 doesn't have any kind of harassing going on?

18   A.   Yes.

19   Q.   Did you pick up any rumors about how the teachers

20 felt about this?

21   A.   Uh-huh.

22   Q.   How did they feel about it?

23        MR. SOLMS:  Say yes or no.

24        THE WITNESS:  Yes.  They -- most of them agreed

25   with it.  Only four complained.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

```
 1   BY MR. SHULMAN:

 2        Q.   Four complained?

 3        A.   Four complained.

 4        Q.   How'd you -- how'd you get the number?

 5        A.   Well, I heard it -- heard it from someone.

 6        Q.   Who did you hear it from?

 7        A.   Ms. Roberts told me that only four complained.

 8        Q.   Four teachers complained?

 9        A.   Out of the whole entire school.

10        Q.   Did any teacher say anything to you directly?

11        A.   No, sir.

12        Q.   Were any others, to the best of your knowledge,

13   asked to repaint?

14             MR. SOLMS:   Any other FCA people?

15   BY MR. SHULMAN:

16        Q.   Anyone?

17        A.   They just came to me.

18        Q.   Anyone at all?

19        A.   Oh, they --

20        Q.   Go to class or Mrs. Roberts, or go to class and

21   say, hey, to the student, repaint?

22        A.   They just -- they came to me for the FCA panels.

23   They came to me 'cause they knew I was the one in charge.

24        Q.   I'm not talking about FCA.  Did Mrs. -- to the

25   best of your knowledge -- if you don't know, you don't
```

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   know -- were any other students asked by Mrs. Roberts to

2   repaint?

3       A.   I remember one, but that was it, only one.   Only

4   one -- only one other one.

5       Q.   Another one was?

6       A.   One other.

7       Q.   Why was he asked to paint -- repaint?

8       A.   Because of the Satan -- Satan sign.

9       Q.   The Satan?

10      A.   Yeah.

11      Q.   Okay.   With whom did you talk after the painting

12   was altered?

13      A.   Like that -- like that Monday night or --

14      Q.   Well, the period after that.   Did you seek out

15   Mr. Sweeten and talk to him?

16      A.   After I was pulled out of class, they -- they had

17   a whole bunch of teachers, kind of like the staff, like

18   faculty, was -- not all of them, but just certain, like the

19   assistant principals were kind of there, and pulled Coach

20   Sweeten out, and they pulled me out of class, and Ms.

21   Roberts was there, and they were just kind of just talking

22   like which ones that this -- just talking.

23          It wasn't -- nothing was really brought out,

24   general or anything, it was just talking about what was

25   going on.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    Q.   Did you meet with any -- with Mr. Kornblue after

2  that?

3    A.   No.

4    Q.   Did Mr. Kornblue reflect on how wrong this was to

5  put it down or take it down, or did he indicate his

6  disappointment to you?

7    A.   He -- he was pretty -- he was -- he was upset.

8  He was a little upset about it.  Most of the FCA were upset

9  about it.

10   Q.   Who?

11   A.   The whole -- the group, the -- the -- Fellowship

12  of Christian Athletes were all --

13   Q.   Mr. Sweeten?

14   A.   -- upset.  Yeah, they were a little, I think

15  mostly shocked.  I think that was the word --

16   Q.   What did Mr. Sweeten say, if you remember?

17   A.   I was -- I was still crying.  I don't -- I was

18  still crying about it.

19   Q.   You don't remember?

20   A.   I don't.

21   Q.   Do you remember what Mr. Kornblue said?

22   A.   He wasn't there at the time, at that -- at

23  that --

24   Q.   At any time after that, a week later, three weeks

25  later?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1      A.    There, you know, there was -- they were

2  just -- they were still -- they were kind of disappointed,

3  you know, upset that, you know, but --

4      Q.    Is the Christian club still functioning?

5      A.    Yes.

6      Q.    Okay.  Where will you be going to school next

7  year?

8      A.    To Evangel University.

9      Q.    Which one?

10     A.    To Evangel.

11     Q.    Spell it.

12     A.    E-v-a-n-g-e-l University.

13     Q.    Where is that?

14     A.    In Springfield, Missouri.

15     Q.    When did you apply to that school?

16     A.    This past year, I think, November or October of

17 last year.

18     Q.    Did this incident in any way disturb or interrupt

19 or keep you from getting admission to this school?

20     A.    No, sir.

21     Q.    No.  Is the school a religious school?

22     A.    Yes, it is.

23     Q.    Do you believe that it's within your religious

24 belief to try to win over those who do not believe?

25     A.    Uh-huh, yes, sir.


ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.


561/655-2300

1    Q.   Is that a requirement of your religion?

2    A.   It says -- it says to go unto all the world and

3    preach the good news.

4    Q.   Ah.  So what's the answer?  Is -- is it a part of

5    the religious doctrine?

6    A.   I would say yes.

7    Q.   The answer's yes?

8    A.   Yes.

9    Q.   Have you tried to do so in the past?

10   A.   Yes, sir.

11   Q.   How have you tried to do so in the past?

12   A.   Well, there's many ways.  You can just be kind to

13   someone and love someone, love your neighbor as yourself

14   and, you know, speak to them about God if they don't know

15   about God.  There's -- there's many ways.

16   Q.   Did you ever have a friend who was a non-

17   believer --

18   A.   Yes.

19   Q.   -- or -- you did?

20   A.   Yes, I did.

21   Q.   An atheist?

22   A.   Not -- not -- no.

23   Q.   The answer to that is no?

24   A.   No.

25   Q.   What would make the person a non-believer,

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    though?

2         A.    If they didn't accept Jesus into your heart, I

3    guess, if you want to get technical.

4         Q.    Did you ever wear a religious symbol to school,

5    cross?

6         A.    Yes.

7         Q.    Anybody ever say you can't do that?

8         A.    No.

9         Q.    Had this occurred in your -- did you ever engage

10   in a project like this in the school in Georgia?

11        A.    No, sir.

12        Q.    Would the school of Georgia -- it's speculative,

13   I know.

14              Would they have -- would they have permitted you

15   in Georgia to allow this to stay up?

16        A.    I'd have to say yes.

17        Q.    Your answer's yes?

18        A.    Yes.

19        Q.    Were there any religious activities in that

20   school in Georgia?

21        A.    They had FCA, as well.

22        Q.    They had what?  FCA?

23        A.    They had FCA, as well.  They had Meet You at the

24   Pole.  They had -- if something, like if something happened

25   at the school like -- you would come out and they would --

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   if someone got killed or if some -- if something happened

2   like that, tragic like that, they would -- they would have

3   people come around and -- and pray for that person, meet in

4   the center of somewhere and pray.

5         I remember one day we -- it was before school had

6   started, and we went out there, and we just -- we got in a

7   circle and prayed before school started.  We just came out

8   and --

9   Q.   During school time?

10  A.   No, it was before school, and we just --

11  Q.   Before school?

12  A.   -- asked God to bless our day, et cetera.

13  Q.   And the principal would be there?

14  A.   I guess he would have been there.

15  Q.   Teachers?

16  A.   Yes, they would have been there.

17  Q.   Kind of organized by the school --

18  A.   It was -- no, it was -- it was just individuals

19  coming together.  It wasn't -- it wasn't the FCA.

20        It was like -- I remember one day it was just --

21  it was just students by themselves, and we just came

22  together and prayed before school.

23  Q.   Did you discuss what happened with your clergyman

24  about painting over the sign?

25  A.   I didn't personally talk to him.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1   Q. No?  Okay.  Was the painting signed, the mural,

2 with a signature?

3   A. Signed by me?  No.

4   Q. Did you like Mrs. Roberts?

5   A. Uh-huh.

6   MR. SOLMS:  Say yes.

7   THE WITNESS:  Yes.

8 BY MR. SHULMAN:

9   Q. Did you like Mr. Harris?

10   A. Yes.

11   Q. Can people disagree about religion?

12   A. Yes, they can.

13   Q. Can people disagree as to whether it's offensive?

14   A. Yes, they can.

15   Q. Let me ask you this, Sharah.

16   If you wore a cross as a symbol, perfectly

17 permissible, okay.  What if you drove up with a truck and

18 took a huge wooden cross that was eight feet high and put

19 it on your shoulder and walked across the schoolyard into

20 school with it and leaned it against your locker; would

21 that be okay?

22   A. I would say so.

23   MR. SOLMS: Off the record.

24 BY MR. SHULMAN:

25   Q. Was the project -- was the project open to

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1  everybody in the school?

2      A.   Yes, it was.

3      Q.   So it was a school project?

4      A.   Yes.

5      Q.   Were any outsiders invited to paint on the mural?

6      A.   It was mostly school, the people within the

7  school.

8      Q.   School.  Have you ever distributed religious

9  literature in the school?

10     A.   I haven't, no.

11     Q.   Do you know whether you can or cannot do so?

12     A.   Yes, you can.

13     Q.   You can?

14     A.   Yes, we can.

15     Q.   Would anybody stop you?

16     A.   They couldn't.

17          MR. SHULMAN:  I think we're almost there.  We're

18     getting there, Sharah.

19  BY MR. SHULMAN:

20     Q.   The mural really reflected more than artwork;

21  didn't it?  Reflected a religious message; would you agree?

22     A.   I would say both.  It had -- it had both in

23  there.  It -- you know.

24     Q.   Okay.  Do you believe that religion sometimes can

25  be a controversial subject?

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

1    A.    Yes, it can be.

2         MR. SHULMAN:  I think I'm through.

3         MR. SOLMS:  I have no questions.

4         MR. SHULMAN:  Do you know, Sharah, that you have

5    a right to -- this is going to be transcribed, and you

6    have a right to look at it.  If you choose, you can

7    waive it, and you can review it with your parents and

8    so forth to make sure that it's accurate.

9         So as to whether you want to review it or not,

10   it's up to you, and you can consult with him if you

11   want to.

12        MR. SOLMS:  At this point we won't waive.

13        What arrangements will we have to read it?  Do

14   you want to go ahead and do our copy, or are you

15   ordering it or what?

16        MR. SHULMAN:  I'm -- I'm going to.

17        MR. SOLMS:  We can go off the record.

18        (Whereupon, a discussion was had off the record.)

19        (Whereupon, the deposition was concluded at 1:15

20   p.m.)

21                    *  *  *  *  *

22

23

24

25

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

**RULE 1.310   FLORIDA RULES OF CIVIL PROCEDURE**

   PROVIDES:

   (e)   Any changes in form or substance which the
         witness desires to make shall be entered upon
         the deposition by the officer with a statement
         of the reasons given by the witness for making
         them.


|     PAGE/LINE      |     CHANGE      |     REASON      |
| --- | --- | --- |
|  |  |  |

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.


561/655-2300

1   THE STATE OF FLORIDA )

2   COUNTY OF PALM BEACH )


4           I HEREBY CERTIFY that I have read the foregoing

5   deposition by me given, and that the statements contained

6   therein are true and correct to the best of my knowledge

7   and belief.




10          _____

11                                      SHARAH HARRIS




14  Sworn to and subscribed before

15  me, this ____ day of _____, 2002.




19  _____

20  Notary Public







            ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.


                          561/655-2300

## CERTIFICATE OF OATH

THE STATE OF FLORIDA

COUNTY OF PALM BEACH

      I, the undersigned authority, hereby certify that SHARAH HARRIS, personally appeared before me and was duly sworn to tell the truth, the whole truth and nothing but the truth.

      WITNESS MY HAND AND OFFICIAL SEAL this 10th day of September, 2002.

Sophie M. Springer, Notary Public.

State of Florida at Large.

My commission expires: Sept. 13, 2004



Sophie M. Springer
MY COMMISSION # CC964085 EXPIRES
September 13, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

## CERTIFICATE OF REPORTER

THE STATE OF FLORIDA

COUNTY OF PALM BEACH



     I, Sophie M. Springer, Notary Public, State of Florida at Large,

     DO HEREBY CERTIFY that the foregoing deposition of SHARAH HARRIS, was taken before me in this cause at the time and place and in the presence of counsel as set forth in the caption page hereto; that the foregoing and annexed pages, numbered 1 through 140, inclusive, is a true record of the testimony of said witness and of all proceedings had at the session at which said testimony was given.

     I FURTHER CERTIFY that I am not related to or employed by any of the parties or their counsel, nor am I interested in the outcome of this action.

     IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 10th_ day of September, 2002.

_Sophie M. Springer_

Sophie M. Springer, Notary Public.



Sophie M. Springer
MY COMMISSION # CC964085 EXPIRES
September 13, 2004
BONDED THRU TROY FAIN INSURANCE, INC.

ASSOCIATED COURT REPORTERS OF PALM BEACH COUNTY, INC.

561/655-2300

# PROJECT OF THE YEAR JUDGING SHEET

School Name    *Boca Raton High*

Category    *School Service*

Project Name    *Paint A Panel*

A.   Overall – What does it look like?          10 points        7
     (2pts off for each cover violation)
     (School name, project category, project name)
     (Does this project fit this category?)

B.   Completeness – Is all the information present
                              Documentation?     20 points        17

C.   Project Planning – Does it depict efficient
                              Planning?           20 points        17

D.   Originality – Is this project unique, uncommon,
                              Or a new twist?     10 points        5

E.   Narrative – Is the report well written?
                              Spelling/Grammar    5 points         3

                              Goals (meet description)   10 points    8

                              Description         10 points        8

                              Evaluation          10 points        7

F.   Judge's Discretionary Points                 5 points         3.

TOTAL POINTS          (100 points possible)                        75

Judge's Comment Area:

DEF'S EX. # 1
Ans 8-5-2002

10

# PROJECT OF THE YEAR JUDGING SHEET

School Name   *Boca Raton High School*

Category   *School Service*

Project Name   *Paint - A - Panel*

A.   Overall – What does it look like?                    10 points          6
     (2pts off for each cover violation)
     (School name, project category, project name)
     (Does this project fit this category?)

B.   Completeness – Is all the information present
                          Documentation?          20 points          18

C.   Project Planning – Does it depict efficient
                          Planning?                20 points          18

D.   Originality – Is this project unique, uncommon,
                          Or a new twist?          10 points          7

E.   Narrative – Is the report well written?
                          Spelling/Grammar         5 points           5

                          Goals (meet description)  10 points          8

                          Description               10 points          10

                          Evaluation                10 points          8

F.   Judge's Discretionary Points                   5 points           3

TOTAL POINTS            (100 points possible)                          83

Judge's Comment Area:

# PROJECT OF THE YEAR JUDGING SHEET

School Name    Boca Raton High School

Category    School Service

Project Name    Paint a Panel

A.    Overall – What does it look like?      10 points      10
        (2pts off for each cover violation)
        (School name, project category, project name)
        (Does this project fit this category?)

B.    Completeness – Is all the information present
                      Documentation?      20 points      20

C.    Project Planning – Does it depict efficient
                      Planning?      20 points      19

D.    Originality – Is this project unique, uncommon,
                      Or a new twist?      10 points      9

E.    Narrative – Is the report well written?
                      Spelling/Grammar      5 points      4

                      Goals (meet description)      10 points      9

                      Description      10 points      10

                      Evaluation      10 points      10

F.    Judge's Discretionary Points      5 points      4.

TOTAL POINTS      (100 points possible)      95

Judge's Comment Area:

10

## PROJECT PLANNING (Project of the Year-Page 2)
Please list in bullet format taken to complete this project with due dates.

| TASK | DUE DATE |
|------|----------|
| • The school Beautification Project idea was discussed within the SGA class. | January 22, 2002 |
| • A proposal was typed addressing administration for approval of project. | January 23, 2002 |
| • A proposal was sent to the administration. | January 25, 2002 |
| • The project was approved by the administration. | January 28, 2002 |
| • Flyers were made and put up around school campus. | January 29, 2002 |
| • An announcement was written advertising the project. | January 29, 2002 |
| • A memo was typed and sent to club and sport sponsors. | January 31, 2002 |
| • The panels were numbered from 1-60 with spray paint. | February 5, 2002 |
| • Two panels were painted for advertisement. | February 6, 2002 |
| • A list was made with panel numbers and names for identification purposes. | February 7, 2002 |
| • The project took place. Panels were painted by the students. | February 9, 2002 |
| • Committee members reviewed the panels for profanity. | February 9, 2002 |
| • The student/faculty committee formed to review future panel paintings and to insure appropriateness. | February 11, 2002 |

**VERIFICATION:**

We, the representatives of *Boca Raton* High School, verify that this project being submitted to the Florida Association of Student Councils as part of the Project of the Year competition was completed as stated by our student council from state convention to state convention.

*Jennifer Ohrn*
Student Council President

*Kathy Roberts*
Student Council Advisor

DEF'S EX. # 2
Ama 3-5-2002